82 Cal.App.3d 737 (1978)
147 Cal. Rptr. 510
HOTEL & RESTAURANT EMPLOYEES & BARTENDERS UNION, LONG BEACH & ORANGE COUNTY, LOCAL 681, AFL-CIO, Plaintiff and Appellant,
v.
ANAHEIM OPERATING, INC., et al., Defendants and Respondents.
Docket No. 19353.
Court of Appeals of California, Fourth District, Division Two.
July 12, 1978.
*740 COUNSEL
Cantrell & Green, John W. Cairns, Richard J. Cantrell and Gregory Mooney for Plaintiff and Appellant.
DeMarco, Beral, Greenberg, Thrall & Slusher, Richard C. Greenberg, Gerald Tockman and Louis N. Laderman for Defendants and Respondents.
OPINION
McDANIEL, J.
The action in the trial court was for defamation and brought by the Hotel and Restaurant Employees and Bartenders Union (Union) against Anaheim Operating, Inc., doing business as the Sheraton-Anaheim Hotel (Hotel) and its employee, Peter Lorusso. Hotel and Lorusso demurred to Union's complaint on the ground that the state court was without jurisdiction to hear the suit. The trial court sustained the demurrer and afforded Union an opportunity to amend. However, Union chose to stand on its complaint. As a consequence, the complaint *741 was dismissed and judgment was entered in favor of Hotel and Lorusso. Union now appeals from that judgment.

FACTS
Early in 1977, a National Labor Relations Board (NLRB) supervised election was scheduled for April of that year for the purpose of enabling employees of Hotel to choose an exclusive bargaining agent. Union participated in the preelection campaign, hoping to gather sufficient votes to become the employees' agent. Also, as part of that campaign, Hotel circulated a "Staff Memo," signed by Lorusso, which stated: "In the next [few] weeks before the election we will be giving you `Facts' about Hotel and Restaurants Employees Local 681, and why you don't need that union here. [¶] Over the years I have felt, and I feel even more strongly now, that the Hotel Union has nothing to offer our people. Both myself and our Hotel feel this way not because we are `against Unions' but  as `The Facts' will tell you  BECAUSE WE ARE PRO-EMPLOYEE. Those `Facts,' taken from the Union's own records  will show: ... What the Union's connections with organized crime and other `underworld' elements are ..."
On April 11, Union lodged a complaint with the NLRB, charging Hotel with unfair labor practices within the meaning of section 8, subdivision (a) of the National Labor Relations Act.[1] As the basis for the *742 charge, Union claimed that "... the employer distributed the attached bulletin falsely alleging the Union to be connected with organized crime and the underworld."
The Regional Director of NLRB responded to Union's charge with a letter stating that an investigation of the charge had been made and "[a]s a result of the investigation, it does not appear that further proceedings on the [charge] are warranted.... [T]he investigation revealed ... that the Employer's preelection campaign newsletter alleged as unlawful is protected expression, within the meaning of Section 8(c)[[2]] of the Act. Shopping Kart Food Market, 228 NLRB No. 190. I am, therefore refusing to issue a complaint in these matters."
On the same day that Union filed the charge noted, April 11, it also filed suit for defamation against Hotel and Lorusso in the Orange County Superior Court. In its complaint, Union alleged that the statement inferring its connection with organized crime and underworld elements was false, and that Hotel and Lorusso made the statement either knowing it to be false or with reckless disregard for its truth or falsity. Union further alleged that, in publishing the statement, Hotel and Lorusso acted deliberately and with intent to harm it in its efforts to organize the employees. Union then stated, "As a direct and proximate result of the said misconduct ... [Union] has been injured in its business and occupation as a collective bargaining agent for employees within the hotel and restaurant industry, has been exposed to hatred, contempt, and *743 ridicule and has caused [Union] to be shunned and avoided by the employees of [Hotel] so as to create damage to the plaintiff in organizing the said employees and in conducting an election campaign for an election to be held on April 29, 1977 by the National Labor Relations Board [Union] is thereby entitled to general damages." For these alleged wrongs, Union prayed for punitive damages in the sum of $1 million plus costs and attorney's fees.
On April 29, the election was held. Union was not chosen as the employees' bargaining agent.
In May, Hotel and Lorusso filed a demurrer to Union's complaint, claiming that the state court was without jurisdiction to hear the suit "in that the matters there alleged lie within the exclusive and primary jurisdiction of the National Labor Relations Board." The trial court sustained the demurrer, and, as stated above, offered Union an opportunity to amend its complaint. Union declined to amend, and the trial court then dismissed the complaint and entered judgment in favor of Hotel and Lorusso. Union appeals from the judgment. We conclude that the position urged by Union is correct, we, therefore, reverse the judgment.

ISSUE, DISCUSSION AND DISPOSITION
We are presented with one question: whether a state court may hear a defamation action based on particular speech which the NLRB has declared to be "protected expression within the meaning of section 8(c)"[3] of the National Labor Relations Act (the act), and which, the plaintiff has alleged, exposed it to hatred, contempt and ridicule in the hotel and restaurant industry. Responding to this question first calls for an analysis of the extent to which the jurisdiction of the NLRB over labor relations preempts possible state jurisdiction. The thorough and skillful analysis of this issue by counsel for both parties prompts a review of the development of the law of federal preemption in the field of labor relations, and a description of the present state of that law. This review and description will be accomplished in the first part of the opinion. We will then determine the applicability of the law of preemption to the particular *744 facts of the case before us. We will conclude by discussing the impact if any on this case of the NLRB's decision in the Shopping Kart case.
(1) Basically, when Congress grants to a federal agency the exclusive power to occupy a specific field of regulation, the law of preemption provides that state regulation of that field is strictly forbidden. Thus, if Congress intended to permit the NLRB, alone, to govern labor relations, state courts could not entertain suits which attempt to penalize conduct within that area. Just where the line is to be drawn in labor-management relations regulations between exclusive federal jurisdiction and federal/state concurrent jurisdiction has long troubled the United States Supreme Court.
Early cases suggested that states could apply their own common law, but could not apply state rules specifically enacted to regulate labor regulations. (Motor Coach Employees v. Lockridge, 403 U.S. 274, 290 [29 L.Ed.2d 473, 484-485, 91 S.Ct. 1909].) Other early decisions allowed the states to interject themselves into labor relations where they could provide a remedy not available under federal law. (Id., at p. 291 [29 L.Ed.2d at p. 485].) Still others allowed state intervention so long as state court decisions were not inconsistent with federal labor law. (Id.) All these approaches were eventually rejected by the court. (Id.)
A workable rule finally began to emerge beginning with the 1953 decision in San Diego Unions v. Garmon, 359 U.S. 236 [3 L.Ed.2d 775, 79 S.Ct. 773]. There, the union had peacefully picketed the employer and attempted to persuade the employer's customers to boycott the company as part of the effort to force the employer's acceptance of a "closed shop" agreement. In the action that followed, the California Supreme Court upheld a damage award against the union. Both parties conceded that the union's conduct constituted an unfair labor practice under section 8, subdivision (b) of the act.[4]
*745 When the case reached the United States Supreme Court, it began its opinion by discussing the extent of federal preemption of the labor area: *746 "`[T]he Labor Management Relations Act[[5]] "leaves much to the states, though Congress has refrained from telling us how much."... The penumbral area can be rendered progressively clear only by the course of litigation.' [Citation.] ... [¶] In determining the extent to which state regulations must yield to subordinating federal authority, we have been concerned with delimiting areas of potential conflict; potential conflict of rules of law, of remedy, and of administration." (San Diego Unions v. Garmon, supra, 359 U.S. 236, 240, 241-242 [3 L.Ed.2d 775, 780-781].)
The court then formulated the following general rule: "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act,[[6]] or *747 constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law." (Id., at p. 244 [3 L.Ed.2d at p. 782].)
However, the court recognized two exceptions to this general rule: it would "not [withdraw] from the States [the] power to regulate [1] where the activity regulated was a merely peripheral concern of the Labor Management Relations Act[,]" and (2) "where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." (Id., at pp. 243-244 [3 L.Ed.2d at p. 782].) The court concluded that the peaceful picketing and economic pressure which formed the basis of the suit did not fit within either of the categories excepted. Therefore, under the general rule formulated, it held that the state court could not exercise jurisdiction in the case before it.
Following Garmon, the Supreme Court handed down its decision in Linn v. Plant Guard Workers, 383 U.S. 53 [15 L.Ed.2d 582, 86 S.Ct. 657]. During a campaign to organize employees, the union circulated a leaflet alleging that the employer's general managers lied to employees. The company had also lodged an unfair labor practice complaint with the NLRB. The board, however, rejected the company's request for relief because it found that the leaflet had not been distributed by the union or its agents. Linn, a general manager, then filed suit against the union in federal court seeking damages for defamation. The United States District Court dismissed the action stating as its ground, under Garmon, that the NLRB had exclusive jurisdiction because the activity was arguably an unfair labor practice. The circuit court of appeals affirmed.
The Supreme Court began its analysis of the case by noting that "[l]abor disputes are ordinarily heated affairs ... representation campaigns are frequently characterized by bitter and extreme charges ... vituperations, personal accusations, misrepresentations and distortions." (Id., at p. 58 [15 L.Ed.2d at p. 587].) It further noted that federal labor policy favored free debate on issues dividing labor and management, and *748 that the NLRB had a legitimate interest in uniform regulation of labor relations. On the other hand, the court recognized the states' interest in protecting its citizens from defamatory attacks. The court stated that its determination of the extent to which the jurisdiction of the NLRB superseded that of state courts in defamation actions represented an accommodation of these conflicting interests. That accommodation was contained in the following rule. "[W]here either party to a labor dispute circulates false and defamatory statements during a union organizing campaign, the court does have jurisdiction to apply state remedies if the complainant pleads and proves that the statements were made with malice[[7]] and injured him."[8] (Linn v. Plant Guard Workers, supra, 383 U.S. 53, 55 [15 L.Ed.2d 582, 586].)
This "departure from [the] well-established rule" (id. at p. 72 [15 L.Ed.2d at p. 595]) announced in Garmon was justified on several grounds: First, statements uttered with malice are not entitled to the protection of section 7 of the act, which allows employees to form, join, or assist labor organizations and to bargain collectively and engage in concerted activity, and to refrain from any of the above activities. Because section 7 does not protect the utterance of malicious defamation, state regulation of such defamation is "a `merely peripheral concern of the Labor Management Relations Act[.]'" (Linn v. Plant Guard Workers, supra, 383 U.S. 53, 61 [15 L.Ed.2d 582, 589].) As stated above, Garmon specifically held that state regulation of matters which peripherally concerned the act constituted an exception to the general rule and was permissible.
Second, the opinion declared that the state has "an overriding... interest" in protecting its citizens from malicious libel, and this interest "is `so deeply rooted in local feeling and responsibility' that it fits within the exception specifically carved out by Garmon." (Linn v. Plant Guard Workers, supra, 383 U.S. 53, 62 [15 L.Ed.2d 582, 589].)
*749 Third, it continued, "`[t]o the extent ... that Congress has not prescribed procedure for dealing with the consequences of tortious conduct already committed, there is no ground for concluding that existing criminal penalties or liabilities for tortious conduct have been eliminated....'" (Id., at pp. 61-62 [15 L.Ed.2d at p. 589].)
Fourth, "[w]hile the Board might find that an employer or union violated § 8 [outlawing unfair labor practices] by deliberately making false statements, or that the issuance of malicious statements during an organizing campaign had such a profound effect on the election as to require that it be set aside, it looks only to the coercive or misleading nature of the statements rather than their defamatory quality. The injury that the statement might cause to an individual's reputation ... has no relevance to the Board's function. [Citation.]" (Id., at p. 63 [15 L.Ed.2d at p. 590]; italics added.)
Fifth, "[t]he Board can award no damages, impose no penalty, or give any other relief to the defamed individual. [¶] On the contrary, state remedies have been designed to compensate the victim and enable him to vindicate his reputation. The Board's lack of concern with the `personal' injury caused by malicious libel, together with its inability to provide redress to the maligned party, vitiates the ordinary arguments for pre-emption." (Id., at pp. 63-64 [15 L.Ed.2d at p. 590].) "The fact that the Board has no authority to grant effective relief aggravates the State's concern since the refusal to redress an otherwise actionable wrong creates disrespect for the law and encourages the victim to take matters into his own hands. The function of libel suits in preventing violence has long been recognized." (Id., at p. 64, fn. 6 [15 L.Ed.2d at p. 590].)
Sixth, "`damages for personal injuries may be assessed without regard to the merits of the labor controversy....' [¶] Judicial condemnation of the alleged attack [on plaintiff's character] would reflect no judgment upon the objectives of the union. It would not interfere with the Board's jurisdiction over the merits of the labor controversy." (Id., at p. 64 [15 L.Ed.2d at p. 591].)
Linn was followed in 1974 by Letter Carriers v. Austin, supra, 418 U.S. 264. During the Letter Carriers' organizational drive, a list of postal workers who refused to join the union was published in the union's newsletter, along with a description of these individuals as "scabs," "two-legged animal[s] with ... corkscrew soul[s], ... water brain[s], ... *750 combination backbone[s] of jelly and glue" and other noncomplimentary terms. (Id., at p. 268 [41 L.Ed.2d at p. 752].) A libel action in state court followed. A demurrer was interposed to the complaint on the ground that the suit sought regulation of speech that was protected by the First Amendment and federal labor law. However, the trial court overruled the demurrer, relying on Linn. An award of damages was returned by the jury and affirmed by the state's supreme court. The United States Supreme Court, after it heard the case, reaffirmed much of its earlier analysis in Linn and concluded, although the state courts had jurisdiction to proceed in defamation actions, that in this particular action the language did not constitute libel.
The last decision, Farmer v. Carpenters, 430 U.S. 290 [51 L.Ed.2d 338, 97 S.Ct. 1056], was handed down in March 1977. There, a union member sued the union in the Los Angeles Superior Court for intentional infliction of emotional distress. The member alleged that the union discriminated against him in making referrals for employment because of his unpopular views and that it had thereby breached its collective bargaining agreement with him. He further claimed that the union "engaged in outrageous conduct, threats, and intimidation, and had thereby caused him to suffer grievous emotional distress...." (Id., at p. 293 [51 L.Ed.2d at p. 345].)
A demurrer was filed by the union in which it claimed that the suit was preempted by the NLRB's exclusive jurisdiction. The trial court sustained the demurrer as to the discrimination and breach of the collective bargaining contract causes of action, but denied it as to the emotional distress allegation. The case went to trial on that issue, and both general and punitive damages were awarded by the jury on that theory. The Court of Appeal reversed, stating that the "crux" of the action was conduct which was arguably subject to the exclusive jurisdiction of the NLRB.
The United States Supreme Court accepted the case, and after hearing it, began its unanimous opinion by discussing the exceptions to the Garmon rule which had developed over the years by means of both congressional action[9] and court decision. As to the latter salient, state actions involving mass picketing and threats of violence, wrongful expulsion from union membership, and "malicious libel" (id. at p. 297 *751 [51 L.Ed.2d at p. 348]) came to be permitted because they concerned the act only peripherally and were deeply rooted in local feeling and responsibility. The court stated that these exceptions "highlight our responsibility ... to determine the scope of the general rule by examining the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme." (Farmer v. Carpenters, supra, 430 U.S. 290, 297 [51 L.Ed.2d 338, 348].) "[I]nflexible application of the [Garmon] doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme." (Id., at p. 302 [51 L.Ed.2d at p. 351].)
In applying some of the factors present in the Linn case to the case before it, the court stated that the act did not protect the "outrageous conduct" which was the subject of the suit. "[T]here is no federal protection for conduct on the part of union officers which is so outrageous...." (Id.) The court recognized the state's interest in keeping its people free from emotional distress as analogous to its interest in regulating defamation.
(2) From this progression of decisions, it is clear that there is a willingness to subordinate the Garmon rule of preemptive NLRB jurisdiction where other more pressing state interests are present. Whether or not the rule is to be bypassed in a particular situation "must depend upon the nature of the particular interests being asserted and the effect upon the administration of national labor policies of concurrent judicial and administrative remedies." (Vaca v. Sipes, 386 U.S. 171, 180 [17 L.Ed.2d 842, 852, 87 S.Ct. 903].) Therefore, in deciding whether or not to subordinate the Garmon rule in this instance requires our review of the interests at stake and of the effect of such subordination on national labor policies.[10] (Sears, Roebuck & Co. v. Carpenters, 436 U.S. 180 [56 L.Ed.2d 209, 98 S.Ct. 1745].)
As to the first point, Linn recognizes that the NLRB has an interest in maintaining a uniform labor policy and in promoting the free exchange *752 of ideas during an election. The state, however, has a cognizable interest in protecting its citizens from malicious defamation. The court in Linn labeled this latter interest "overriding" and "`so deeply rooted in local feeling and responsibility' that it fits within the exception specifically carved out by Garmon." (Linn v. Plant Guard Workers, supra, 383 U.S. 53, 62 [15 L.Ed.2d 582, 589].) Thus, according to Linn, the state interest in this area of activity outweighs competing federal interests. We must now decide if the state interest in protecting individual citizens from malicious defamation applies with equal force to defamatory-type statements directed at a labor union.
We turn then to an application of the foregoing principles and inquiries to the facts before us. Hotel and Lorusso assert that the Union's interest in remaining free from malicious defamation is "not and never [has] been held to be cognizable under state law...." They add that unlike an individual, a union and an employer have the resources and forum available to defend themselves against such defamation,[11] and that Linn applies only to individuals.
(3) As to the first point, the California Supreme court has concluded that "[t]he social and economic realities of the present-day organization of society has ... led [courts] to recognize the suability of unions. [Fn. omitted.] ... If, however, we hold that these organizations are thus subject to suit but that they cannot sue, we create a gross anomaly. We cannot arbitrarily split so obvious an equation. [Fn. omitted.]" (Daniels v. Sanitarium Assn., Inc., 59 Cal.2d 602, 607-608, 610 [30 Cal. Rptr. 828, 381 P.2d 652].) Thus, the court ruled that a labor union, as an entity, could sue another for defamation. This pronouncement by our Supreme Court clearly indicates that the Union's interest in remaining free from defamation is indeed cognizable. The nature of the Union's interest can be analogized to that of a corporation which has an interest in preserving its good business reputation. Accordingly, "language which casts aspersions upon its business character is actionable." (Di Giorgio Fruit Corp. v. AFL-CIO, 215 Cal. App.2d 560, 571 [30 Cal. Rptr. 350].) We therefore can *753 find no basis for the proposition that the Union's interest in remaining free of malicious libel is not protected by state law.
Next, Hotel and Lorusso claim that resources to combat defamation are readily available to unions and employers, but not to individuals. They fail to tell us what those resources are, or how effective they may be; however, we note that Linn has been applied without hesitation to allow suits by corporations for activities occurring during union organizational campaigns. (Farah Mfg. Co. v. Amalgamated Clothing Wkrs., etc., supra, 483 S.W.2d 271; Mooi Roofing Company v. De Young, supra, 156 N.W.2d 617; R.H. Bouligny, Inc. v. United Steelworkers of Amer., supra, 154 S.E.2d 344.) In light of this, it would be unfair to deny a union the same privilege. Surely, Hotel and Lorusso cannot argue that a union somehow has resources to defend itself which an employer does not have.
The final contention, that Linn does not apply to unions and employers but only to individuals, is also without merit. An identical contention was made in Mooi Roofing Company v. De Young, supra, 156 N.W.2d 617. Therein, the Michigan court concluded: "To restrict the Linn decision in such a manner would result in an incongruity  a State court could entertain a defamation suit arising out of a labor dispute where a natural person is maliciously injured, but not where an employer or union is defamed." (Id., at p. 620.) Indeed, the language found in Linn indicates that it was intended to apply to unions, employers, and employees alike. The court stated: "We conclude that where either party to a labor dispute circulates false and defamatory statements during a union organizing campaign, the court does have jurisdiction to apply state remedies if the complainant pleads and proves that the statements were made with malice and injured him." (Linn v. Plant Guard Workers, supra, 383 U.S. 53, 55 [15 L.Ed.2d 582, 586]; italics added.) The court also discussed and dismissed the possibility that "employers and unions [would] spurn appropriate administrative sanctions" if state suits were available. (Id., at p. 66 [15 L.Ed.2d at p. 592]; italics added.) It is apparent that the court wished to make Linn equally applicable to suits brought by unions, employers and individuals. Hotel and Lorusso have presented us with no persuasive reason to draw distinctions between the three.
Having determined that the state interests in permitting suits are sufficiently strong, we must examine the effect that subordination of the Garmon rule in this instance would have on national labor policy. Hotel and Lorusso argue that permitting a state suit in this instance would *754 interfere with uniform federal labor policy and would stifle the free flow of debate which that policy seeks to promote.
The consistency of federal labor policy may well not be as important as Hotel and Lorusso believe it is. "[T]he ... fact that Congress and this Court have deferred to the States in these areas indicates a subordination of the interest in uniformity to the interests of the States.... [T]he interest in uniformity is subordinated to the larger interests that persons injured ... have preserved to them whatever remedies state law may authorize.... [T]he `rule' of uniformity that the Court invokes today is at best a tattered one, and at worst little more than a myth." (Motor Coach Employees v. Lockridge, supra, 403 U.S. 274, 317-318 [29 L.Ed.2d 473, 500-501], White, J. dis.)
Hotel and Lorusso first claim that, in its complaint, Union "requests the court below to assess the effect of [the] pre-election conduct upon the election." They further assert that "the nature of [Union's] injury [is] the effect that pre-election conduct had upon its reputation among the employee-electorate," and that the complaint "seeks damages, or the `value' of its injury, equal to the `value' of the loss of the election."
(4) Because of the nature of Union's claims, Hotel and Lorusso argue that the substance of their complaint cannot be decided without regard to the merits of underlying labor controversy, "an impermissible inquiry." However, close scrutinization of the complaint reveals that the Union claims to have been injured "in its business and occupation as a collective bargaining agent for employees within the hotel and restaurant industry." (Italics added.) Union also claims further injury in that it has "been exposed to hatred, contempt, and ridicule and [the defamation] has caused the plaintiff to be shunned and avoided by the employees of the [Hotel]." (Italics added.)
The first two of these claims are totally unrelated to the labor dispute between Union and the Hotel employees. The initial claims state that Union's reputation in the general business community has been injured and that Union has been exposed to hatred, etc., before all observers, and not merely workers at Hotel. Because we are obliged to give liberal construction to the Union's pleadings, we cannot ignore these allegations of injury which are unrelated to the labor dispute between the Union and Hotel.[12] Additionally, the complainant could not possibly have been *755 seeking damages for "the `value' of the loss of the election," as Hotel and Lorusso claim it did. The complaint was filed on April 11 and the Union did not lose the election until April 29.
Contrary to the position urged by Hotel, Linn established, in its review, that the NLRB "looks only to the coercive or misleading nature of the statements rather than their defamatory quality. The injury that the statements might cause to ... reputation ... has no relevance to the Board's function.... `[D]amages for personal injuries may be assessed without regard to the merits of the labor controversy....'" (Linn v. Plant Guard Workers, supra, 383 U.S. 53, 63-64 [15 L.Ed.2d 582, 590-591].) We see no reason, nor have Hotel and Lorusso given us one, not to apply the court's analysis of the issue as stated in Linn to a defamation action brought by the Union.
Next, Hotel and Lorusso contend, because the NLRB has already decided that the so-called libelous speech is protected under the act, that the state court in the interests of uniformity may not hear a case involving such speech. However, both the fact that the conduct is or may be covered by the act and the NLRB's declaration that it is do not displace state jurisdiction.[13] In Farmer and Linn, the court while anticipating NLRB review in the form of an unfair-labor-practices complaint, was not deterred from concluding that the state court could, in each case, *756 entertain an action for the tortious conduct committed. As a consequence, in the case now before us, we view the NLRB's decision not to take jurisdiction because the alleged defamatory statement is protected speech under section 8, subdivision (c) to be the equivalent of assuming, as the court has done in numerous cases, that the conduct there at issue was either protected by section 7 of the act or prohibited by section 8. In all of those cases, the court proceeded to allow state court actions where the interest in permitting such actions so required, this despite the fact that the conduct was also otherwise cognizable under the act. The only significance we can see in the NLRB's decision as noted is to foreclose further proceedings to have the election set aside by the NLRB, or to be "made whole" by the NLRB because an unfair labor practice had been committed. This in no way precludes a state court action, which as Linn pointed out has an entirely different focus than does a proceeding before the NLRB.
(5) Finally, Hotel and Lorusso argue, if state courts are permitted to hear such suits, that "50 different standards of propriety during an organizational campaign" would be created, and thus uniformity would *757 suffer. However, in such instances, "the Court has required that, in the interests of uniform development of the law, state courts must apply federal law." Motor Coach Employees v. Lockridge, supra, 403 U.S. 274, 314 [29 L.Ed.2d 473, 499].) Accordingly, California had adopted the rule, enunciated in Linn, that the plaintiff, in order to make out a case for relief, in any action for defamation arising out of a labor dispute, must prove that the statement was made with malice and injured him. (Gregory v. McDonnell Douglas Corp., 17 Cal.3d 596, 600 [131 Cal. Rptr. 641, 552 P.2d 425]; Emde v. San Joaquin County etc. Council, 23 Cal.2d 146, 154 [143 P.2d 20, 150 A.L.R. 916].) Thus, the danger of a standard of propriety different from that established in Linn, is nonexistent if suit is brought in California.
(6) We must also determine if allowing a suit in state court would interfere with the free exchange of ideas which federal labor policy seeks to promote. This question has been sufficiently answered by the court in Linn. Therein, the court emphasized that application of the "malicious defamation with resulting injury" requirement represented an accommodation of the free exchange of ideas and the prevention of defamation. We can find no better way to accommodate these conflicting interests. As in the "yelling `fire' in a crowded theatre" approach to First Amendment rights, free speech in the context of labor relations cannot go unbridled if it confronts an equally important interest militating against it. Therefore, we conclude that allowing state court actions for defamation will not impermissibly interfere with the free exchange of ideas in the labor relations arena.
(7) Our examination of the interests at stake in allowing a state court action and the effect such a suit would have on federal labor policy compels us to conclude that the union should be allowed to bring suit for defamation. An excellent statement of our position herein is contained in Mooi Roofing Company v. De Young, supra, 156 N.W.2d 617: "`Since the board is unconcerned with the defamatory character of the statement, a judicial determination that the statements were libelous in character would have no effect upon the board's jurisdiction over the merits of the labor dispute itself. Thus the injury caused ... by a defamatory statement is merely incidental to the board's inquiry and the application of state remedies would be a "merely peripheral concern of the labor management relations act." [¶] [T]he states' concern with redressing malicious libel is "so deeply rooted in local feeling and responsibility `that an overriding state interest' ... should be recognized." [Fn. *758 omitted.] The traditional justification for libel actions, namely the tendency of libel or slander to cause a breach of the peace, is closely related to the breach of the peace line of cases recognized in Garmon. The Supreme Court itself has recognized maintenance of the peace as one of the purposes of civil actions for libel. Moreover, the state is traditionally concerned with providing a peaceful forum to which [those] whose reputations have been damaged ... can bring their claims. Balanced against such meaningful State interests, the use of the known lie as a tool has so little social utility that it should be afforded the minimum protection consistent with national labor policy.' [Fn. omitted.]" (Id., at p. 622.) We believe that the six factors justifying the Linn decision apply with equal force where a defamation suit is brought by a union. Therefore, such a suit must be permitted.[14]
We turn finally to the impact of the NLRB's decision in the Shopping Kart Food Market, supra, 94 LRRM 1705, case on this case. We begin with Shopping Kart's predecessor, Hollywood Ceramics Co., 51 LRRM 1600, also an NLRB decision. In the latter case, the employer distributed a handbill to employees the day before the election which contained substantial misrepresentations. The NLRB concluded that the election should be set aside "`only where there [had] been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not [fn. omitted], may reasonably be expected to have a significant impact on the election.'" (Id., at p. 1601; italics added.) The crux of the NLRB's decision was that such misrepresentations interfered with the employees' free choice; therefore, the election was set aside.
In April 1977, the NLRB decided the Shopping Kart Food Market case. The company vice-president, on the eve of the election, had misrepresented to employees the amount of profit the company made. The NLRB stated, "[W]e decide today that the Board will no longer probe into the truth or falsity of the parties' campaign statements. Accordingly, we hereby overrule Hollywood Ceramics." (Id., at p. 1705.) The NLRB stated that use of the Hollywood Ceramics rule had resulted in "extensive analysis of campaign propaganda, restriction of free speech, variance in *759 application as between the Board and the courts, increasing litigation, and a resulting decrease in the finality of election results." (Shopping Kart Food Market, supra, 94 LRRM 1705, 1706.) This resulted from the fact that "`[d]eterminations regarding the substantiality and materiality of particular misrepresentations are necessarily highly subjective. It would be difficult for any tribunnal [sic] ... to reach uniform and consistent results in the application of such standards. The timing test ... may raise vexatious issues of fact regarding what is required for an "effective" opportunity for reply.'" (Id., at p. 1706.) It is precisely because the NLRB must, whenever an election is challenged, apply each of these "vague and flexible standards" before it may set aside an election and because a court could then pass upon the NLRB's determination in each case that confusion and lack of uniformity resulted. Court review of the NLRB's decisions was primarily responsible for inconsistent decisions and long delays.
The NLRB further stated that Hollywood Ceramics Co., supra, 51 LRRM 1600, was based on the NLRB's unwillingness "to leave the voters `to sort out, with no protection from us, from among a barrage of flagrant deceptive misrepresentations,'" and on its "assumption that misleading campaign propaganda will interfere with employees' freedom of choice. Implicit in such an assumption is a view of employees as naive ... whose decision ... is easily altered by the self-serving campaign claims of the parties." (Shopping Kart Food Market, supra, 94 LRRM 1705, 1707.) However, the NLRB found that workers were no longer naive and should be allowed to assess precampaign statements for themselves. It concluded that "we will no longer set elections aside on the basis of misleading campaign statements." (Id., at p. 1708.)
Hotel and Lorusso now claim, even if Linn permits the exercise of state court jurisdiction over this case, that "the major policy shift of the NLRB announced in Shopping Kart has expanded the scope of absolutely protected pre-election speech to such a degree that the preemption exception of Linn cannot apply to a cause of action by a union for libel...."[15] However, they forget that Shopping Kart merely held, for *760 purposes of affirming or rejecting election results, that the NLRB would not look into the truth or falsity of the subject statements. The confusion and lack of uniformity inherent in the former approach necessitated the holding in Shopping Kart. In fact, the case did not at all deal with the issue of preemption, nor did it declare that the NLRB may not review the truth or falsity of a campaign statement when an unfair labor practice charge is brought based on the statement. Clearly, the focus of Linn, malicious injury to reputation, is far removed from the focus of Shopping Kart, the employees' ability to exercise free choice in an election.[16]
Hotel and Lorusso add that in Linn the court commented, "[I]f experience shows that a greater curtailment, even a total one, should be necessary [on defamation suits] ... the Court will be free to reconsider today's holding." (Linn v. Plant Guard Workers, supra, 383 U.S. 53, 67 [15 L.Ed.2d 582, 592].) They argue that this paved the way for what they allege is Shopping Kart's "curtailment" of defamation suits. However, we note that the United States Supreme Court said that it, and not the NLRB, may limit such suits when necessary. Despite the position urged upon us, the United States Supreme Court remains the final authority on the meaning and construction of the act (R.H. Bouligny, Inc. v. United Steelworkers of Amer., supra, 154 S.E.2d 344, 357), and as recently as May 15, 1978 reiterated its support of Linn. (See Sears, Roebuck & Co. v. Carpenters, supra, 436 U.S. 180.) Additionally, as we stated above, we can see no inconsistency between Linn and Shopping Kart because the two cases dealt with the distinctly different issues.
Finally, Hotel and Lorusso argue that the high court has expanded the freedom of parties involved in elections to engage in "uninhibited, robust, and wide-open debates," citing Letter Carriers v. Austin, supra, 418 U.S. 264. Therein, as we have noted, the union newsletter had printed several uncomplimentary comments about nonunion postal workers. The court reiterated the holding in Linn that if the plaintiff alleged malicious defamation and injury to himself, he could maintain his action. The court went on to find, based on past Supreme Court decisions, that the *761 comments were, as a matter of law, not defamatory. The court's recognition of the importance of "uninhibited, robust and wide-open debate" in Austin was, by no means, new. Indeed, it was recognized in Linn as one of the factors to be balanced against the state's interest in penalizing defamation. The end result of this balancing process was, of course, the rule requiring the plaintiff to allege malicious defamation and injury to himself. We can carry Austin no further than this, and particularly we cannot agree with Hotel and Lorusso that Austin alters the effect of Linn.
The judgment is reversed, with directions to the trial court to afford defendants, Anaheim Operating, Inc. and Pete Lorusso, an opportunity to answer Union's complaint.
Tamura, Acting P.J., concurred.
KAUFMAN, J.
I concur fully in both the judgment of reversal and the reasoning in the main opinion. The purpose of this separate concurring opinion is to emphasize a point which may prove vital upon trial.
The point to be emphasized is that plaintiff's allegations concerning its injury and damages suffered by it are ambiguous.[1] It cannot be ascertained with any assurance of accuracy whether plaintiff claims to have suffered compensable injury to its reputation within the hotel and restaurant industry generally or whether the only injury it suffered was in organizing Anaheim's employees in respect to the representation election to be held April 29, 1977. Defendants did not challenge the sufficiency of these allegations by a demurrer on the ground no cause of action was stated or by special demurrers for uncertainty or ambiguity. They chose instead to demur on the sole ground of exclusive NLRB jurisdiction. Under these circumstances, we have given plaintiff the benefit of the doubt and viewed its allegations as including an allegation of compensable *762 injury to its reputation within the hotel and restaurant industry generally. However, if the only injury alleged was to its reputation among Anaheim's employees, reducing its effectiveness in organizing those employees with respect to the representation election, the case would be an entirely different case and defendants' contention of exclusive NLRB jurisdiction might be meritorious.
Respondents' petition for a hearing by the Supreme Court was denied September 20, 1978.
NOTES
[1] Section 8, subdivision (a) of the National Labor Relations Act is found at 29 United States Code section 158. It provides:

"(a) It shall be an unfair labor practice for an employer 
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;
"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;
"(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;
"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."
[2] Section 8, subdivision (c) of the National Labor Relations Act is found at 29 United States Code section 158. It provides: "(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."
[3] Section 8 generally defines what an unfair labor practice is. Section 8, subdivision (c) specifically focuses on expressions of particular views, and declares them not to be unfair labor practices. It must be kept in mind that section 8, subdivision (c) neither grants specific rights, as does section 7, nor does it prohibit certain conduct, as does section 8, subdivisions (a) and (b).
[4] Section 8, subdivision (b) of the act is found at 29 United States Code section 158. It provides:

"(b) It shall be an unfair labor practice for a labor organization or its agents 
"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;
"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;
"(3) to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 159(a) of this title;
"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise, handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is 
"(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;
"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
"(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;
"(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: Provided, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter: Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;
"(5) to require of employees covered by an agreement authorized under subsection (a)(3) of this section the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected;
"(6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed; and
"(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
"(A) where the employer has lawfully recognized in accordance with this subchapter any other labor organization and a question concerning representation may not appropriately be raised under section 159(c) of this title,
"(B) where within the preceding twelve months a valid election under section 159(c) of this title has been conducted, or
"(C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: Provided, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159(c) (1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: Provided further, That nothing in this subparagraph (C) shall be construed to prohibit any picketing, or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.
"Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this subsection."
[5] The Labor Management Relations Act was a 1947 amendment to the National Labor Relations Act. The latter act, as it was originally enacted in 1935, governed only practices by employers. The 1947 amendment, which added subdivision (b) to section 8 of the act, dealt with conduct by unions.
[6] Section 7 of the act is found at 29 United States Code section 157. It provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."
[7] A defamatory statement is made "with malice" if it is made with knowledge of its falsity or with reckless disregard for its truth or falsity. (Linn v. Plant Guard Workers, supra, 383 U.S. 53, 61 [15 L.Ed.2d 582, 589].)
[8] The types of injury which may serve as the basis for a defamation suit include "general injury to reputation, consequent mental suffering, alienation of associates, specific items of pecuniary loss, or whatever form of harm would be recognized by state tort law." (Linn v. Plant Guard Workers, supra, 383 U.S. 53, 65 [15 L.Ed.2d 582, 591].)

This particular test was utilized because, while the NLRB tolerated "intemperate, abusive and inaccurate statements," it would not allow malicious defamation. (Letter Carriers v. Austin, 418 U.S. 264, 272-273 [41 L.Ed.2d 745, 755, 94 S.Ct. 2770].)
[9] Statutory exceptions to the general Garmon rule can be found at 29 United States Code sections 164(c), 185 and 187.
[10] Hotel and Lorusso argue that "Linn [did not create] a blanket preemption exemption for libel actions arising in a labor relations context." Without discussing the merits of this statement, suffice it to say that the only test we are obliged to utilize in deciding whether to avoid the implications of the Garmon rule is that stated above. (Farmer v. Carpenters, supra, 430 U.S. 290, 297 [51 L.Ed.2d 338, 348]; Vaca v. Sipes, supra, 386 U.S. 171, 180 [17 L.Ed.2d 842, 852].)
[11] Hotel and Lorusso carry the distinction between the individual and the Union or employer further by claiming that suits brought by an individual are cognizable while those brought by the Union or the employer are not. However, R.H. Bouligny, Inc. v. United Steelworkers of Amer., 270 N.C. 160 [154 S.E.2d 344]. Mooi Roofing Company v. De Young, 9 Mich. App. 295 [156 N.W.2d 617], and Farah Mfg. Co. v. Amalgamated Clothing Wkrs., etc. (Tex.Civ.App.) 483 S.W.2d 271, were all state suits brought by companies against the union.
[12] The United States Supreme Court said most recently in Sears, Roebuck & Co. v. Carpenters, supra, 436 U.S. 180, that although the federal and state actions arose in the same factual setting, the respective controversies presented to the state and federal forums would not have been the same. "The critical inquiry ... is not whether the State is enforcing a law relating specifically to labor relations ... but whether the controversy presented to the state court is identical to ... or different from ... that which could have been ... presented to the Labor Board." (Id., at p. 197 [56 L.Ed.2d at p. 225].) As will be made clear in the latter part of the opinion, the state tort action here is quite different from the unfair labor practice's complaint brought before the board.
[13] In their brief Hotel and Lorusso cite Weber v. Anheuser-Busch, Inc., 348 U.S. 468 [99 L.Ed. 546, 75 S.Ct. 480], as stating that if the NLRB finds conduct to be protected under the act, the state may not enjoin that conduct. This position is simply a restatement of the general rule enunciated in Garmon. However, Linn, which was decided after Weber, carved out an exception to the Garmon rule for malicious defamation lawsuits.

During oral argument, Hotel and Lorusso cited Sears, Roebuck & Co. v. Carpenters, supra, 436 U.S. 180, as further questioning this assertion. In Sears, the union peacefully picketed one of Sears' stores, on store property. Sears brought an action to enjoin the trespass. On the basis of Garmon's exception for "conduct which touches interests `so deeply rooted in local feeling and responsibility.'" the lower court deemed that jurisdiction properly rested with the state, and granted the injunction. The California Supreme Court reversed, finding that the picketing was arguably protected by section 7 of the act, thus, the state could not assume jurisdiction. The United States Supreme Court reversed the California Supreme Court, stating that, although the conduct was both arguably protected by section 7 and prohibited by section 8, the same factors which we have discussed in the text of this opinion militated against foreclosure of state jurisdiction.
The only reference made in Sears to a situation in which review by the NLRB precedes a state court action was the following dicta: "The primary jurisdiction rationale justifies preemption only in situations in which an aggrieved party has a reasonable opportunity ... to invoke the Board's jurisdiction...." (Id., at p. 201 [56 L.Ed.2d at p. 228].) We assume that it is this passage which Hotel and Lorusso believe countermands all that we have previously said. However, a careful reading of Sears demonstrates otherwise. Therein, the court explained that the theory of primary jurisdiction "is used to refer to the various considerations articulated in Garmon ... that militate in favor of pre-empting state court jurisdiction...." (Id., at p. 199, fn. 29 [56 L.Ed.2d at p. 226].) Garmon, like Sears, spoke of conduct which is protected by section 7 or prohibited by section 8, subdivisions (a) and (b). In the case now before us, the NLRB declared that Hotel's commentary was "protected ... within the meaning of Section 8(c)...." That section grants no substantive rights, as does section 7, nor does it prohibit certain types of conduct, as does section 8, subdivisions (a) and (b). Rather, it merely states that certain expression shall not be deemed an unfair labor practice. We view the NLRB's use of the word "protected" in connection with section 8, subdivision (c) to be most unfortunate, for the section protects absolutely nothing.
The primary jurisdiction theory relates solely to conduct which is protected by section 7 or prohibited by section 8, subdivisions (a) and (b), and has no application to conduct within the meaning of section 8, subdivision (c). For conduct which is neither protected by section 7 nor prohibited by section 8, subdivisions (a) and (b), the test is whether Congress intended that conduct be regulated exclusively by the federal government. (Machinists v. Wisconsin Emp. Rel. Comm'n, 427 U.S. 132, 146 [49 L.Ed.2d 396, 406-407, 96 S.Ct. 2548].) The Supreme Court's decision in Linn, which was cited with approval in Sears, indicates the court's belief that Congress did not intend to exclusively occupy the field of defamatory conduct. Thus, there is nothing in Sears that can be construed as prohibiting state jurisdiction over the Union's suit.
[14] A suit for defamation may be brought on the ground that damage has been done to an entity's business reputation. (De Giorgio Fruit Corp. v. AFL-CIO, supra, 215 Cal. App.2d 560, 571.) For purposes of this appeal, it is sufficient to note that Union has alleged injury to its business reputation.
[15] Hotel and Lorusso hint that because Linn cited the Hollywood Ceramics case, its validity was reduced by the overruling of the later decision. In Linn, the court cited Hollywood Ceramics in its presentation of the NLRB's approach to misrepresentation. Relying on cases other than Hollywood Ceramics, the court also stated that the NLRB would not tolerate malicious defamation. The malicious defamation test was imposed because of this and because it was necessary to accommodate the conflicting interests of federal labor policy and the state's interest in permitting defamation suits. However, in no wise can it be asserted that the holding in Linn is substantially or even notably dependent on the distinction formerly made by the NLRB between ordinary defamation and malicious defamation. None of the six factors listed by the court in its decision in Linn relates to the NLRB's then-established distinction. Therefore, the overruling of Hollywood Ceramics cannot be said to invalidate Linn.
[16] Nowhere in Shopping Kart is Linn discussed, nor does Shopping Kart deal with the distinction between ordinary defamation and malicious defamation, which is the key of the Linn decision.
[1] Paragraph number 8 of the complaint reads: "As a direct and proximate result of the said misconduct of the defendants, and each of them, the plaintiff has been injured in its business and occupation as a collective bargaining agent for employees within the hotel and restaurant industry, has been exposed to hatred, contempt, and ridicule and has caused the plaintiff to be shunned and avoided by the employees of the defendant, ANAHEIM OPERATING, INC. so as to create damage to the plaintiff in organizing the said employees and in conducting an election campaign for an election to be held on April 29, 1977 by the National Labor Relations Board. Plaintiff is thereby entitled to general damages."