[No. A037738. First Dist., Div. Two. Dec. 15, 1988.]

RAUL RODRIGUEZ, Plaintiff and Appellant, v.
YELLOW CAB COOPERATIVE, INC., Defendant and Respondent.

## COUNSEL

Louis A. Highman, Lawrence Ball and Bruce J. Highman for Plaintiff and Appellant.

James J. Meyers, Jr., and Meyers, Merrill, Schultz & Wolds for Defendant and Respondent.

## OPINION

**KLINE, P. J.**—This appeal presents the question whether the National Labor Relations Act bars a wrongful discharge suit against a former employer.

### STATEMENT OF THE CASE

Appellant, Raul Rodriguez, filed a complaint against respondent, Yellow Cab Cooperative, Inc., challenging the termination of his employment. Other causes of action having been dismissed, the two at issue were for wrongful discharge in violation of public policy and in violation of California Labor Code sections 1101 and 1102, which prohibit employers from interfering with the political activities of employees. Both causes of action alleged mental anguish and emotional distress suffered as result of respondent's wrongful conduct.

Respondent moved for summary judgment on the theory, among others, that the National Labor Relations Act (NLRA) preempted the entire action.[1] The trial court granted the motion. This timely appeal followed.

### STATEMENT OF FACTS

The facts pertinent to the issue we address are as follows. Appellant was employed by respondent from November 21, 1977, until his termination on

---

[1] Respondent's principal alternative contentions were that a decision of the California Unemployment Insurance Appeals Board collaterally estopped appellant from litigating the reasons for his discharge and that a compromise and release entered into between the parties and approved by the Workers' Compensation Appeals Board barred appellant from recovering damages for emotional distress. Respondent also argued that, as a matter of law, it did not violate public policy or Labor Code sections 1101 and 1102 when it discharged appellant.

October 19, 1982. During that time he received many warnings concerning refusal to convey passengers in violation of company rules and a San Francisco ordinance. Respondent also warned appellant about complaints it had received about overcharging and insulting passengers, rude conduct at hotels at which he picked up passengers, and tardiness in returning his cab at the end of his shift. Company regulations provided that drivers were subject to discharge upon accumulation of such complaints.

Respondent provided appellant numerous verbal and written warnings that he would be terminated if his work record did not improve. Appellant was suspended twice for refusing to convey passengers. When respondent received two more such complaints in the fall of 1982 it discharged appellant for "repeated refusal to convey and . . . many other violations of company rules."

While appellant worked for respondent, he founded a labor organization, the Independent Cab Drivers Association (Union), and organized fellow employees. As president of the Union, appellant filed unfair labor practice charges in behalf of other employees. Appellant claimed to be a "moving force behind the filing" of a class action suit alleging that respondent's taxi cab leasing system violated a local ordinance and inhibited collective bargaining. Finally, appellant testified in behalf of the Union before the California Public Utilities Commission (PUC) in opposition to respondent's application for airport van permits, which he claimed was against the interest of cab drivers.

After being terminated, appellant filed an unfair labor practice charge with the National Labor Relations Board (NLRB or Board), claiming he was discharged in retaliation for his union activities. After investigating the charge, the NLRB refused to issue a complaint on the ground that other employees had been discharged for misconduct similar to that which led to appellant's termination. Appellant argues that the instant wrongful discharge suit is not based on the allegation that respondent fired him for his union activities. He claims the gravamen of this suit is his allegation that the company fired him in retaliation for his testimony before the PUC, and, to a lesser extent, his instigation of the class action suit—"political" activities assertedly different from the union activities on which he based his unfair labor practice charge. Respondent, on the other hand, argues that the issues raised in the instant complaint are identical to those raised before the NLRB.

DISCUSSION

*The NLRA Preempts the Instant Claims*

A. *Standard of review.*

Summary judgment is proper where the papers submitted show there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) ■ A defendant who makes the motion must negate a necessary element of the plaintiff's case or establish a complete defense, so that under no hypothesis is there any factual matter requiring a trial. (*Vanderbilt Growth Fund, Inc.* v. *Superior Court* (1980) 105 Cal.App.3d 628, 633-634 [164 Cal.Rptr. 621].) ■ On appeal, we must construe the opposing party's evidence liberally, viewed in the light most favorable to that party. (*Malmstrom* v. *Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299, 313 [231 Cal.Rptr. 820].)

A motion for summary judgment tests the sufficiency of the pleadings and a judgment for the defendant should be affirmed if the plaintiff cannot state a cause of action. (*Barnett* v. *Delta Lines, Inc.* (1982) 137 Cal.App.3d 674, 682 [187 Cal.Rptr. 219]; *Johanson Transportation Service* v. *Rich Pik'd Rite, Inc.* (1985) 164 Cal.App.3d 583, 588 [210 Cal.Rptr. 433].) If there was any legal basis upon which the trial court could have granted summary judgment, we must affirm its order even if it used an incorrect ground for its decision. (9 Witkin, Cal. Procedure (3d ed. 1985) §§ 259-261, subd. (d), pp. 266-268.) Hence, although the trial court did not address respondent's argument that the NLRA preempted appellant's suit for wrongful discharge, we address the issue because we find it dispositive.

B. *Appellant's political activities are arguably protected by the NLRA.*

■ The NLRA does not explicitly provide for preemption, so courts must look to congressional intent. (*Metropolitan Life Ins. Co.* v. *Massachusetts* (1985) 471 U.S. 724, 747 [85 L.Ed.2d 728, 745, 105 S.Ct. 2380]. " '[C]ourts sustain a local regulation "unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." ' " (*Id.*, at pp. 747-748 [85 L.Ed.2d at p. 745], quoting *Allis-Chalmers Corp.* v. *Lueck* (1985) 471 U.S. 202, 209 [85 L.Ed.2d 206, 213-214, 105 S.Ct. 1904], quoting *Malone* v. *White Motor Corp.* (1978) 435 U.S. 497, 504 [55 L.Ed.2d 443, 450-451, 98 S.Ct. 1185].)

In *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236, 245 [3 L.Ed.2d 775, 783, 79 S.Ct. 773], the Supreme Court enunciated what has come to be known as the *Garmon* rule of preemption, which protects the exclusive jurisdiction of the NLRB over unfair labor practices: "When an activity is arguably subject to [section] 7 or [section] 8 of the [NLRA],[2] the States as well as the federal courts must defer to the exclusive competence of the [NLRB]." However, *Garmon* recognized that the "federal system" allows state regulation of activities of "peripheral concern of the Labor Management Relations Act. [Citation.] Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." (*Id.,* at pp. 243-244 [3 L.Ed.2d at p. 782], fn. omitted.) Even if the NLRB declines to act, a state court may not assert jurisdiction over an unfair labor practice. (*Guss* v. *Utah Labor Board* (1957) 353 U.S. 1, 8 [1 L.Ed.2d 601, 605-606, 77 S.Ct. 598].)[3]

Section 7 guarantees employees the right to self-organize, bargain collectively, and "engage in other concerted activities for the purpose of collective bargaining or other mutual aid and protection . . . ." Section 8 makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" section 7. We must determine whether the NLRB has exclusive jurisdiction over the conduct at issue, the alleged discharge in violation of public policy and California Labor Code sections 1101 and 1102. More specifically, we must decide if the activities for which appellant claimed he was fired—his testimony before the PUC or his involvement in the class action lawsuit against respondent—were (1) concerted and (2) for the purpose of collective bargaining or mutual aid and protection.

First, there is no doubt that the activities were "concerted" within the meaning of the NLRA. The lawsuit was filed on behalf of the Union, with the express purpose of remedying conduct claimed to undermine the collective bargaining process. At the PUC hearing appellant not only declared that he represented the Union but specifically addressed the subject of cab driver job security and other issues of concern to Union members.[4]

---

[2] Sections 7 and 8 of the NRLA define unfair labor practices. (29 U.S.C. §§ 157, 158.) Further citation will be to these sections, not to the United States Code.

[3] A 1959 amendment to the NLRA provided that states could act where the Board declined to act on the ground that an alleged unfair labor practices has too little impact on interstate commerce. (29 U.S.C. § 164 (c)(2).) This amendment has no bearing on the instant case because the NLRB declined to issue a complaint for substantive reasons.

[4] At the hearing, appellant read a 1980 letter from respondent's president stating that the company had no intention of running an airport van service because it would directly compete with cab service. Appellant attempted to demonstrate that the company realized the

Next, we examine the goal of the activities in question to determine whether they fall within the ambit of section 7. Arguably, the stated purpose of the class action lawsuit—ending "practices . . . [which] imping[e] upon the bargaining position of [the] employees and [the Union]" —made it an activity "for the purpose of collective bargaining." However, as there is no indication the Union and the company were then bargaining, it is more likely the lawsuit, if protected at all, came under the "other mutual aid and protection" prong of section 7. The testimony before the PUC could only be protected by this prong.

In *Eastex, Inc.* v. *NLRB* (1978) 437 U.S. 556 [57 L.Ed.2d 428, 98 S.Ct. 2505], the union distributed a newsletter urging employees to write their legislators opposing inclusion of the Texas right-to-work law in the state Constitution and discussing the President's veto of a federal minimum wage bill. The Supreme Court pointed out that the " 'mutual aid or protection' clause protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums, and that employees' appeals to legislators to protect their interests as employees were well within the scope of this clause."[5] (*Id.,* at pp. 565-566 [57 L.Ed.2d at p. 439].) The court also noted that section 7 was patterned on language in the Norris-LaGuardia Act which "expresses Congress' recognition of the 'right of wage earners . . . to act jointly in questions affecting . . . the welfare of labor generally . . . .' " (*Id.,* at p. 565, fn. 14 [57 L.Ed.2d at p. 439], quoting Sen. Rep. No. 163, 72d Cong., 1st Sess., p. 9 (1932) [italics omitted].) Although the Supreme Court found it unnecessary "to delineate precisely the boundaries of the 'mutual aid or protection' clause" (*id.,* at p. 568 [57 L.Ed.2d at p. 441]), it did hold that distribution of the newsletter was protected under section 7 of the NLRA. (*Id.,* at p. 570 [57 L.Ed.2d at p. 441].)

Other federal courts that explore the scope of "mutual aid and protection" have observed that lawsuits relating to labor matters are generally

---

proposed service would cut into the earnings of cab drivers, who were already losing income from potential airport fares due to the number of competing van services presently licensed. Indeed, appellant suggested that because current van services were operating at less than full capacity, more permits would lead to unfair competition. In addition to testifying directly about the impact of the proposed van service on respondent's cab drivers, appellant addressed a number of other matters over which the Union and the company disagreed.

[5] In a footnote to this section, the court cited a number of cases involving complaints to administrative bodies. (*Eastex, Inc.* v. *NLRB, supra,* 437 U.S. at p. 566, fn. 15 [57 L.Ed.2d at p. 439].) For example, *Socony Mobil Oil Co., Inc.* v. *N.L.R.B.* (2d Cir. 1966) 357 F.2d 662, involved a complaint to the Coast Guard; *Walls Manufacturing Company* v. *N.L.R.B.* (1963) 321 F.2d 753 [116 App.D.C. 140], considered a complaint to the state health department; and *Alleluia Cushion Co.* (1975) 221 NLRB 999 concerned an Occupational Safety and Health Administration complaint. Although not strictly an allegation addressed to an administrative body, appellant's PUC testimony would be protected for the same reasons, because he attempted to convince the PUC that issuing the van service permit would hurt respondent's employees' interests.

preempted by section 7. (*Altex Ready Mix Concrete Corp.* v. *N.L.R.B.* (5th Cir. 1976) 542 F.2d 295, 297; *Leviton Manufacturing Company, Inc.* v. *N.L.R.B* (1st Cir. 1973) 486 F.2d 686, 689; see also *Hob Nob Hill Rest.* v. *Hotel & Rest. Employ. Union* (S.D.Cal. 1987) 660 F.Supp. 1266 [NLRA preempted a restaurant's civil claim against a union seeking damages for the union's attempts to have criminal charges filed against the restaurant regarding its tip policy].) The class action appellant helped initiate related to a labor-management problem because it claimed that respondent's taxi cab leasing system deprived drivers of their status as employees and therefore, as stated in the complaint, adversely affected the Union's collective bargaining position. Thus, we conclude that the lawsuit was an arguably protected activity.

*Kaiser Engineers* v. *N.L.R.B.* (9th Cir. 1976) 538 F.2d 1379, 1384-1385, indicates that appellant's testimony before the PUC is also protected by section 7. In that case the court affirmed a finding that an employer committed an unfair labor practice by firing and disciplining employees who wrote their congressmen concerning the enforcement of immigration laws. The letter writing was held a protected activity because of the effect of immigration regulations on job security. (*Kaiser Engineers* v. *N.L.R.B., supra,* 538 F.2d at p. 1385; see also *Misercordia Hospital Medical Ctr.* v. *N.L.R.B.* (2d Cir. 1980) 623 F.2d 808, 813.) Appellant's testimony at the PUC hearing was motivated by similar concerns regarding the effect of respondent's proposed van service on job security and, therefore, seems to us arguably within the exclusive jurisdiction of the NLRB.

C. *Appellant's activities do not fall within any exception to NLRA preemption.*

Determining that appellant's activities were arguably protected by section 7 does not end the analysis. As other California courts have recognized, we must additionally determine whether the conduct fits within any of the exceptions to the *Garmon* rule developed over the years. (*Hotel & Restaurant Employees etc. Union* v. *Anaheim Operating, Inc.* (1978) 82 Cal.App.3d 737 [147 Cal.Rptr. 510]; *National Football League Management Council* v. *Superior Court* (1983) 138 Cal.App.3d 895 [188 Cal.Rptr. 337].) ■ As earlier noted, *Garmon* explicitly stated that its broad preemption rule did not encompass matters of "peripheral concern of the Labor Management Relations Act" or "deeply rooted in local feeling and responsibility." (*San Diego Unions* v. *Garmon, supra,* 359 U.S. at pp. 243-244 [3 L.Ed.2d at p. 782].) The Supreme Court has reasoned that these exceptions highlight judicial responsibility "to determine the scope of the general [preemption] rule by examining the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme."

(*Farmer* v. *Carpenters* (1977) 430 U.S. 290, 297 [51 L.Ed.2d 338, 348, 97 S.Ct. 1056].) Where the state interest is great and the risk of interference small, "inflexible application of the [preemption] doctrine is to be avoided." (*Id.*, at p. 302 [551 L.Ed.2d at p. 351].) As the court later pointed out, "[t]he critical inquiry . . . is not whether the State is enforcing a law relating to labor relations or one of general application but *whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been . . . presented to the [NLRB]*. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid." (*Sears, Roebuck & Co.* v. *Carpenters* (1978) 436 U.S. 180, 197 [56 L.Ed.2d 209, 225-226, 98 S.Ct. 1745], italics added, fn. omitted.)

In *Farmer* v. *Carpenters, supra,* the Supreme Court balanced the potential conflict between the "federal regulatory scheme" embodied in the NLRA and a state-court cause of action against a union for tortious conduct inflicting "'grievous mental and emotional distress as well as great physical damage.'" (430 U.S. at p. 301 [51 L.Ed.2d at p. 351].) Though the court found that the allegations of tortious conduct "might form the basis for unfair labor practice charges" before the NLRB (*id.*, at p. 302 [51 L.Ed.2d at p. 351]), it concluded that Congress did not intend to oust state court jurisdiction. (*Id.*, at p. 305 [51 L.Ed.2d at p. 353].) The court preliminarily posited two questions: (1) did the nature of the conduct complained of create a risk that the lawsuit would result in regulation of conduct protected by the NLRA? and (2) did the state have a substantial interest in protecting the plaintiff from the harm he alleged? (*Id.*, at pp. 302-303 [51 L.Ed.2d at pp. 351-352].)

The court then weighed the potential risk against the state interest by considering whether the NLRB and the state court would have "discrete concerns" about the conduct in question. (430 U.S. at p. 304 [51 L.Ed.2d at p. 352].) If the two forums would focus on different aspects of the plaintiff's allegations, the "potential for interference" with the federal scheme was "insufficient to counterbalance the legitimate and substantial [state] interest." (*Id.*, at p. 304 [51 L.Ed.2d at p. 352].) ▮ Emphasizing the limits of its holding, *Farmer* "reiterate[d] that concurrent state-court jurisdiction cannot be permitted where there is a realistic threat of interference with the federal regulatory scheme. . . . Simply stated, it is essential that the state tort be . . . a function of the . . . manner" in which the employer acts "rather than a function of the actual [conduct] . . . itself." (*Id.*, at p. 305 [51 L.Ed.2d at p. 353].)

■ Addressing the second of the two questions posited by *Farmer,* we have no difficulty finding that California has an interest both in enhancing access to the courts and encouraging citizen involvement in the fact-finding process of the PUC, an activity analogous to constitutionally protected petitions to government agencies. (*Matossian* v. *Fahmie* (1980) 101 Cal.App.3d 128, 135-137 [161 Cal.Rptr. 532]; U.S. Const., 1st Amend.; Cal. Const., art. I, § 3.) As a corollary, the state has a legitimate interest in preventing any adverse employment consequences that may impede use of public forums for the redress of grievances.

As to the remaining question, however, we find a significant risk that the instant state court action might interfere in the regulation of conduct protected by the NLRA. If appellant were able to show that the reasons given were pretexts, and he was actually terminated in retribution for his testimony before the PUC or his participation in the lawsuit, he would prove respondent committed what is arguably an unfair labor practice. (See, *ante,* pt. B.) ■ In *Farmer,* the union allegedly inflicted emotional distress by discriminating against one of its members in the hiring hall, which, as noted, could also provide the basis for an unfair labor practice charge under the NLRA. The reason the claim was not one that might only be charged under the NLRA was the egregiousness of the conduct; as the court observed, there is no uniquely federal protection for conduct "which is so outrageous that 'no reasonable man in a civilized society should be expected to endure it.'" (*Farmer* v. *Carpenters, supra,* 430 U.S. at p. 302 [51 L.Ed.2d at p. 351].) Thus, the plaintiff would receive damages solely for the "particularly abusive manner" in which the union discriminated against him, not for the "actual or threatened discrimination itself." (*Id.,* at p. 305 [51 L.Ed.2d at p. 353].) In the instant case, there are no separate allegations concerning the nature of respondent's act.[6] Appellant fails to meet *Farmer's* requirement that, if related to employment discrimination, the state tort be "a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual threatened discrimination itself." (*Id.,* at p. 305, fn. omitted.)

■ It is clear that a state court would look at the same aspects of appellant's situation as the Board. The NLRB refused to take action on appellant's charge because it found respondent had "disciplined many other employees engaging in similar conduct" and that appellant was not treated differently from other employees with a similar work record. This would also be the central issue at a trial in state court. That is, appellant could not

---

[6] Appellant's complaint sought damages for emotional distress caused by respondent's conduct. However, on appeal he did not assert a distinct cause of action for intentional infliction of emotional distress. Appellant simply listed mental anguish as a result of the alleged retaliatory discharge.

hope to prevail at such a trial without disproving the factual finding of the NLRB.

■ The distinction appellant would have us draw between the "political activities" he says are at issue in his state court suit and the "union activities" involved in the NLRB proceeding simply cannot be maintained. No matter how they may be labeled, the activities in question all sought to advance the interests of the Union. "[T]he acceptability of 'arguable protection' as a justification for pre-emption in a given class of cases is, at least in part, a function of the strength of the argument that [section] 7 does in fact protect [or prohibit] the disputed conduct." (*Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. at p. 203 [56 L.Ed.2d at p. 229].) There is no doubt section 7 protects the conduct appellant claims resulted in termination of his employment.

Because appellant's state claim might result in regulation of conduct arguably within the jurisdiction of the NLRB there is "a realistic threat" that a state judicial proceeding would impinge on "the federal regulatory scheme." (*Farmer* v. *Carpenters, supra,* 430 U.S. at p. 305 [51 L.Ed.2d at p. 353].)

D. *The cases on which appellant bases his argument involve branches of federal labor law preemption not at issue in this case.*

Appellant's reliance on *Paige* v. *Henry J. Kaiser Co.* (9th Cir. 1987) 826 F.2d 857, cert. den. 486 U.S. 1054 [100 L.Ed.2d 921, 108 S.Ct. 2819] and *Garibaldi* v. *Lucky Food Stores, Inc.* (9th Cir. 1984) 726 F.2d 1367, cert. den. 471 U.S. 1099 [85 L.Ed.2d 839, 105 S.Ct. 2391] is unavailing. These cases, it is true, hold that wrongful discharge claims similar in some respects to the claim here were not preempted and therefore should not have been removed to federal court. However, the cases involved section 301 of the Labor Management Relations Act (LMRA) (29 U.S.C. § 185),[7] not section 7 or section 8 of the NLRA. ■ Preemption under the NLRA and the LMRA occurs in different contexts and involves distinct considerations. (*Allis-Chalmers Corp.* v. *Lueck, supra,* 471 U.S. at p. 212, fn. 6 [85 L.Ed.2d at p. 216].) In section 301 cases the action is preempted if it is based on the meaning of a collective bargaining agreement. (*Lingle* v. *Norge Div. of Magic Chef, Inc.* (1988) 486 U.S. 399 , 405 [100 L.Ed.2d 410, 418, 108 S.Ct. 1877, 1881].) This is a matter to be determined on the pleadings, because under the "well-pleaded complaint rule" a plaintiff may obtain or avoid federal jurisdiction by exclusive reliance on federal or state law. (*Caterpillar, Inc.* v. *Williams* (1987) 482 U.S. 386, 392-393 [96 L.Ed.2d 318,

---

[7] Further references will be to section 301, not to the United States Code.

327, 107 S.Ct. 2425, 2427-2431.) In the case before us, on the other hand, where there is no collective bargaining agreement, the preemption question turns not on the characterization of the action but the nature of the activity called into question: is it arguably protected by the NLRA? This is not a matter that can be manipulated by the selection of a state or federal cause of action. As stated by the Supreme Court in an opinion which gave "fuller explication" of *Garmon* preemption, "[i]t is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern." (*Motor Coach Employees* v. *Lockridge* (1971) 403 U.S. 274, 277, 292 [29 L.Ed.2d 473, 477, 486, 91 S.Ct. 1909].) Moreover, though not germane, we think *Paige* and *Garibaldi* are poorly reasoned. *Paige* erroneously suggests that artful pleading will save a cause of action from *Garmon* preemption. (*Paige* v. *Henry J. Kaiser Co., supra,* 826 F.2d at p. 862.) *Garibaldi* gives lip service to *Farmer,* but clearly does not apply the analysis prescribed in that case.[8] (*Garibaldi* v. *Lucky Food Stores, Inc., supra,* 726 F.2d at p. 1373.) The court focuses entirely on the state interest and fails to consider both whether the employer's conduct was arguably prohibited by the NLRA and whether there was a risk that the state cause of action would interfere with the federal regulatory scheme. (*Ibid.*)

Appellant also relies on *New York Tel. Co.* v. *New York Labor Dept.* (1979) 440 U.S. 519 [59 L.Ed.2d 553, 99 S.Ct. 1328], as did the courts in *Garibaldi* and *Paige. New York Telephone* considered what has come to be called "*Machinists* preemption" (*New York Tel. Co., supra,* at pp. 530-533 [59 L.Ed.2d at pp. 562-565]), which applies to conduct not covered by the *Garmon* rule or by sections 7 and 8 of the NLRA, and which Congress intended to leave unregulated. (*Metropolitan Life Ins. Co.* v. *Massachusetts, supra,* 471 U.S. at p. 749 [85 L.Ed.2d at p. 746], citing *Machinists* v. *Wisconsin Emp. Rel. Comm'n* (1976) 427 U.S. 132 [49 L.Ed.2d 396, 96 S.Ct. 2548].) The Supreme Court views the *Machinists* doctrine as protecting " ' "the balance of power between labor and management expressed in our national labor policy." ' "[9] (*Allis-Chalmers Corp.* v. *Lueck, supra,* 471 U.S. at p. 212, fn. 6 [85 L.Ed.2d at p. 216], quoting *Machinists* v. *Wisconsin*

---

[8] After *Garibaldi* was decided, the Ninth Circuit determined that *Farmer* analysis was not the proper test to apply in section 301 LRMA preemption cases and retreated from *Garibaldi*'s approach to wrongful termination cases involving section 301. (*Vincent* v. *Trend Western Technical Corp.* (9th Cir. 1987) 828 F.2d 563, 565, citing *Allis-Chalmers Corp.* v. *Lueck, supra,* 471 U.S. 202; *Hyles* v. *Mensing* (9th Cir. 1988) 849 F.2d 1213, 1216-1217.)

[9] *Machinists* analysis generally applies to state laws that cover all employees, union and nonunion alike, and potentially upset the economic balance in the collective bargaining process. (See *New York Tel. Co.* v. *New York Labor Dept., supra,* 440 U.S. 519 [unemployment benefits for strikers]; *Metropolitan Life Ins. Co.* v. *Massachusetts, supra,* 471 U.S. 724 [state mandated mental health benefits in any employer sponsored group health plan]; *Fort Halifax Packing Co., Inc.* v. *Coyne* (1987) 482 U.S. 1 [96 L.Ed.2d 1, 107 S.Ct. 2211] [plant closing law].)

*Emp. Rel. Comm'n, supra,* 427 U.S. at p. 146 [49 L.Ed.2d at pp. 406-407].) Whatever relevance *Machinists* analysis may have had in *Garibaldi* or *Paige* is absent in the present case, which involves conduct arguably protected by the NLRA, and which does not bear upon the economic balance between management and unions within the meaning of the case law.

E. *Conclusion.*

 To allow appellant to proceed in state court "might create a significant risk of misinterpretation of federal law and the consequent prohibition of protected conduct [or vice versa]." (*Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. at p. 203 [56 L.Ed.2d at p. 229].) Because appellant's claim is arguably protected by the NLRA and fails to meet the *Farmer* test for exceptions to the *Garmon* preemption rule, exclusive jurisdiction over the conduct alleged in the complaint lies with the NLRB.

The judgment is affirmed.

Smith, J., and Pollak, J.,* concurred.

---

* Assigned by the Chairperson of the Judicial Council.