2008-NMCA-121

192 P.3d 1244

**Marvin J. WEISE and Martha J. Weise, Plaintiffs–Appellants,**

v.

**WASHINGTON TRU SOLUTIONS, L.L.C., Defendant–Appellee.**

No. 27,757.

Court of Appeals of New Mexico.

Aug. 7, 2008.

W.T. Martin, Jr., Martin Law Firm, Carlsbad, NM, for Appellants.

Luis G. Stelzner, Kim A. Griffith, Sheehan, Sheehan & Stelzner, P.A., Albuquerque, NM, for Appellee.

## OPINION

CASTILLO, Judge.

{1} Plaintiffs Marvin J. and Martha J. Weise (Plaintiffs) appeal from the district court's order granting summary judgment in favor of Defendant Washington Tru Solutions, LLC (WTS). Our resolution of this case requires us to evaluate whether Plaintiffs' claims are preempted by the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–169 (2000). We hold that two of the claims—intentional infliction of emotional distress (IIED) and defamation—are preempted by the NLRA. Although it is not clear whether Plaintiffs' third claim—for retaliatory discharge—is preempted, that claim fails under New Mexico law because Marvin Weise (Marvin) was not an at—will employee. Martha Weise's (Martha's) claim for loss of consortium also fails because there are no tenable claims from which it could be derived. Accordingly, we affirm.

## I. STANDARD OF REVIEW

{2} "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582; *see Davis v. Bd. of County Comm'rs*, 1999–NMCA–110, ¶ 11, 127 N.M. 785, 987 P.2d 1172. We resolve all reasonable inferences in favor of the party opposing summary judgment, and we view

the pleadings, affidavits, depositions, answers to interrogatories, and admissions in the light most favorable to a trial on the merits. *See Ocana v. Am. Furniture Co.*, 2004–NMSC–018, ¶ 22, 135 N.M. 539, 91 P.3d 58; *Celaya v. Hall*, 2004–NMSC–005, ¶ 7, 135 N.M. 115, 85 P.3d 239. Once the movant makes a prima facie case for summary judgment, "the burden shifts to the party opposing the motion to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Roth v. Thompson*, 113 N.M. 331, 335, 825 P.2d 1241, 1245 (1992). We apply a de novo standard of review to the district court's decision granting or denying summary judgment. *Self*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582.

## II. BACKGROUND

{3} We set forth the facts in the light most favorable to Plaintiffs, the non-moving parties. *See Celaya*, 2004–NMSC–005, ¶ 7, 135 N.M. 115, 85 P.3d 239. Marvin was employed by WTS as a waste handler at the Waste Isolation Pilot Plant. While employed by WTS, Marvin was an active member of the Paper, Allied–Industrial, Chemical & Energy Workers International Union, Local 4–9477 (PACE). In his capacity as a member of PACE and shop steward, he filed grievances against WTS based on its alleged violations of the Collective Bargaining Agreement (CBA) with PACE. Marvin also filed unfair labor practices charges against WTS with the National Labor Relations Board (NLRB). He alleged that WTS violated Section 7 of the NLRA, in part by retaliating against him for his membership in, or activities on behalf of, PACE. The NLRB consolidated Marvin's claims for purposes of issuing a complaint and scheduling a hearing. Eventually, however, Marvin and WTS entered into a non-NLRB settlement, and Marvin agreed to withdraw the charges and the two related grievances.

{4} Several months after the settlement, Marvin was suspended for three days for allegedly violating certain rules of conduct. He filed a grievance based upon the suspension, and the grievance was resolved—in Marvin's favor—through arbitration, which was required by the CBA. While this griev-

ance was pending, WTS fired Marvin based on allegations that he did not follow certain procedures. Marvin filed another grievance and asserted that his discharge constituted unjust discipline in violation of the CBA. This grievance was resolved through a non-NLRB compromise settlement. Marvin agreed to withdraw the grievance in exchange for a monetary settlement from WTS.

{5} Plaintiffs then filed a complaint against WTS in state court in which Marvin alleged retaliation for whistle-blowing, defamation, and IIED. In the same complaint, Martha, Marvin's wife at the time, sought damages for loss of consortium. Both Plaintiffs and WTS filed motions for summary judgment. The district court entered summary judgment in favor of WTS and denied Plaintiffs' motion for partial summary judgment. The district court determined that all of Marvin's claims were barred by the doctrine of preemption because the claims fell within the purview of the NLRA. The district court also concluded that Martha's loss of consortium claim was barred because it was dependent upon the underlying suit. We include additional facts where relevant in discussing Plaintiffs' claims.

## III. DISCUSSION

{6} Plaintiffs make three arguments on appeal: (1) the IIED, defamation, and retaliatory discharge claims are not preempted by federal law; (2) because those claims are not preempted, Martha's loss of consortium claim is not barred; and (3) the district court improperly denied Plaintiffs' motion for partial summary judgment, which was based on a collateral estoppel theory. We address each argument in turn, beginning with preemption.

### A. Preemption

{7} WTS contends, and the district court agreed, that Plaintiffs' claims are preempted by Sections 7 and 8 of the NLRA. Plaintiffs argue in response that the NLRA does not preempt their claims and, in addition, that the preemption analysis should be performed under Section 301 of the Labor–Management Relations Act (LMRA). 29 U.S.C. § 185(a)

(2000). We first consider whether Plaintiffs' claims are preempted by the NLRA.

■ {8} "When an activity is arguably subject to [Section] 7 or [Section] 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted." *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *see Local 926, Int'l Union of Operating Eng'rs v. Jones*, 460 U.S. 669, 676, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983) (stating that federal preemption extends to all conduct that is "actually or arguably protected or prohibited by the NLRA"). Section 7 of the NLRA states in part that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a) of the NLRA prohibits unfair labor practices and provides in part that:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7];

. . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . [or]

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter[.]

29 U.S.C. § 158(a).

■ {9} The *Garmon* preemption doctrine is necessary to ensure a consistent national labor policy. *See Garmon*, 359 U.S. at 242, 79 S.Ct. 773. However, the doctrine does not apply in limited circumstances: (1) if the conduct in question is "only a peripheral concern" of the NLRA, *Jones*, 460 U.S. at 676, 103 S.Ct. 1453 or (2) if the state law

claims touch " 'interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [a court] could not infer that Congress had deprived the States of the power to act.' " *Farmer v. United Bhd. of Carpenters & Joiners of Am., Local 25*, 430 U.S. 290, 296–97, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) (quoting *Garmon*, 359 U.S. at 243–44, 79 S.Ct. 773). To determine whether a state tort claim is preempted under the NLRA requires an examination of "the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme." *Farmer*, 430 U.S. at 297, 97 S.Ct. 1056. The district court determined that Plaintiffs' claims for IIED, defamation, and retaliatory discharge were preempted by the NLRA. Whether a state claim is preempted by federal law is a legal question that we review de novo. *See Hadrych v. Hadrych*, 2007–NMCA–001, ¶ 5, 140 N.M. 829, 149 P.3d 593. We consider each claim in order to determine whether it is preempted by the NLRA or if an exception to the preemption doctrine applies.

### 1. Intentional Infliction of Emotional Distress

■ {10} In *Farmer*, the United States Supreme Court applied the preemption exception analysis to a state-law IIED claim and held that a union member's claim of IIED was not necessarily preempted by the NLRA. 430 U.S. at 302–05, 97 S.Ct. 1056. The Court recognized, however, that the exception to the preemption doctrine must be limited because a universal exception for every IIED claim could expand concurrent jurisdiction to unacceptable extremes and undermine the principle of preemption. *See id.* at 305, 97 S.Ct. 1056 ("It may well be that the threat, or actuality, of employment discrimination will cause a union member considerable emotional distress and anxiety[, b]ut something more is required before concurrent state-court jurisdiction can be permitted."). The *Farmer* Court limited the IIED exception to preemption by requiring that "the state tort be either unrelated to employment discrimination or a function of the particularly abusive manner in which the

discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself." *Id.; see Viestenz v. Fleming Cos.,* 681 F.2d 699, 703–04 (10th Cir.1982). The Court further constrained the exception by stating that recovery for emotional distress would only be allowed in the context of a labor dispute if the distress resulted from "outrageous" conduct. *Farmer,* 430 U.S. at 305–06, 97 S.Ct. 1056. As a result, in order to avoid preemption by the NLRA, an IIED claim that is brought pursuant to state law must be based on outrageous conduct that is either: (1) unrelated to governed labor practices or (2) accomplished in such an abusive manner that the manner itself becomes the basis for the claim. *See id.* at 305, 97 S.Ct. 1056. We thus turn to the consideration of the *Farmer* factors in order to decide if Plaintiffs' IIED claim is preempted by the NLRA, and we begin with the determinative factor—whether WTS's conduct was outrageous.

■■■ {11} The *Farmer* Court concluded that the IIED claim before it was not preempted by the NLRA in part based on its "understanding that California law permits recovery only for emotional distress sustained as a result of 'outrageous' conduct." *Id.* The Court made clear that "undue interference with federal regulation would be intolerable if state tort recoveries could be based on" conduct that "may be commonplace in various labor contexts." *Id.* at 305–06, 97 S.Ct. 1056. Just as the California plaintiff was required to establish outrageous conduct, so too must New Mexico plaintiffs prove that the conduct at issue was "extreme and outrageous" in order to succeed on an IIED claim. *Baldonado v. El Paso Natural Gas Co.,* 2008–NMSC–005, ¶ 27, 143 N.M. 288, 176 P.3d 277 (internal quotation marks and citation omitted). Extreme and outrageous conduct sufficient to sustain an IIED claim under New Mexico law must be conduct "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Trujillo v. N. Rio Arriba Elec. Coop.,* 2002–NMSC–004, ¶ 25, 131 N.M. 607, 41 P.3d 333 (internal quotation marks and citation omitted); *see* UJI 13–1628 NMRA (defining extreme and outra-

geous conduct as "that which goes beyond bounds of common decency and is atrocious and intolerable to the ordinary person"). Plaintiffs' claims regarding WTS's behavior, as detailed below, do not rise to this level.

■■ {12} Plaintiffs alleged in their complaint that WTS (1) refused to schedule medical appointments for Marvin's work-related injuries, (2) refused to allow Marvin to make doctor visits for those same injuries during work hours, (3) unilaterally changed its past practice of scheduling workers' compensation-related medical appointments for bargaining unit employees, (4) failed to pay Marvin in accordance with its usual procedure, (5) bypassed Marvin for overtime assignments, (6) wrongfully issued a verbal reprimand for absenteeism contrary to the provisions of the CBA, (7) verbally attacked Marvin's character, (8) suspended Marvin without just cause for three days, (9) discharged Marvin, and (10) made false statements in order to support the suspension and termination. Plaintiffs elaborated on their IIED claim during discovery and claimed that the retaliatory acts included the following: (1) failing to punish Marvin's co-workers who allegedly violated procedures, (2) approving unemployment benefits for employees other than Marvin, (3) denying college benefits to Marvin but providing them to other employees, (4) informing Marvin that he would not be paid for time taken for a workers' compensation injury due to the NLRB charges, (5) verbally attacking Marvin on his production, (6) requiring Marvin to use inadequate equipment, and (7) trying to make Marvin violate procedures. These claims support a conclusion that WTS discriminated against Marvin—not that WTS engaged in outrageous conduct. These discrimination claims represent "exactly the kind of conduct which the NLRA seeks to regulate." *Briggs v. Hotel Corp. of the Pac., Inc.,* 73 Haw. 276, 831 P.2d 1335, 1341–42 (1992) (holding that the plaintiff/employee's allegations that his employer made telephone calls to induce the plaintiff to cover up NLRA violations and that he was assigned extra work duties to pressure him to cooperate were not enough to constitute outrageous conduct for purposes of a claim of IIED and

thus his claim was preempted by the NLRA); *see Spielmann v. Anchor Motor Freight, Inc.*, 551 F.Supp. 817, 824–26 (S.D.N.Y.1982) (holding that the plaintiff's allegations that management tried to introduce false evidence at the grievance proceeding to intimidate the plaintiff, "verbally abused" the plaintiff in response to inquiries about pay due to him, and tore down a petition the plaintiff had posted protesting certain work rules were not enough to suggest such outrageous behavior that would exceed all bounds customarily tolerated by decent society).

{13} Marvin may have suffered distress as a result of WTS's actions, but "[e]very employee who believes he has a legitimate grievance [has] some emotional anguish occasioned by his belief that he has been wronged." *Buscemi v. McDonnell Douglas Corp.*, 736 F.2d 1348, 1352 (9th Cir.1984) (internal quotation marks and citation omitted). Based on the allegations, Marvin was treated differently than other employees— but different treatment does not establish extreme and outrageous behavior.

{14} Plaintiffs' brief in chief cites twenty opinions that apply the *Farmer* exemption rule. *See, e.g., Carter v. Sheet Metal Workers' Int'l Ass'n*, 724 F.2d 1472 (11th Cir. 1984); *Humphreys v. PIE Nationwide, Inc.*, 723 F.Supp. 780 (N.D.Ga.1989). Many of these cases consider outrageous conduct as well as the second *Farmer* inquiry, whether the manner of the disciplinary action was so abusive as to form the basis of a claim. The abusive manner of disciplinary action is a factual circumstance that we consider to be related to the outrageous conduct inquiry. Therefore, although we decide this case based on a failure to allege outrageous conduct, we consider the facts of the abusive manner cases in order to more fully distinguish Plaintiffs' claims. Examination of the holdings in those cases fails to convince us that Plaintiffs' proof is sufficient to establish a prima facie case of a particularly abusive manner of discrimination or outrageous conduct. *See Briggs*, 831 P.2d at 1341.

{15} A number of the cases cited by Plaintiffs dismissed the claim for IIED because the *Farmer* criteria were not met. In *Car-*

*ter*, 724 F.2d 1472, the Eleventh Circuit held that conduct by a union that resulted only in lost work opportunities was not sufficiently outrageous to satisfy the *Farmer* standard. *Carter*, 724 F.2d at 1476. In *Viestenz*, 681 F.2d 699, the Tenth Circuit concluded that unjustified threats to discharge the employee, to blackball him with the union, and to force a polygraph examination were insufficient to establish outrageous conduct. *Id.* at 704. In *Humphreys*, 723 F.Supp. 780, the district court concluded that the "plaintiff's declarations filed in opposition to [the] defendant['s] motion for summary judgment [did] not set forth any facts which would support a finding of outrageous conduct; rather, [the] plaintiff's declarations merely recite[d] specific acts of harassment, all of which were covered by the grievance procedure." *Id.* at 785. The district court in *Spielmann* considered a plaintiff's claims that his employer (1) attempted to introduce false evidence at a grievance hearing, (2) verbally abused the plaintiff, (3) tore down a petition that plaintiff had posted in protest of certain work rules, and (4) made irrelevant and inflammatory remarks about the plaintiff at an arbitration hearing. 551 F.Supp. at 824. Based on those facts, that court also determined that the plaintiff's claims did "not suggest such outrageous behavior as is necessary to establish a separate state cause of action for [IIED]." *Id.* at 826. *See also Denton v. Int'l Bhd. of Boilermakers Local 29*, 653 F.Supp. 55, 62 (D.Mass.1986) (holding that employment discrimination is an insufficient basis for allegations of outrageous conduct); *Dunton v. United Ass'n of Journeymen*, 206 Cal. App.3d 44, 253 Cal.Rptr. 374, 378 (Ct.App. 1988) (concluding that the employee suffered only "garden variety" employment discrimination because he was not subjected to threats of physical harm, ridicule, vile language, yelling, screaming, or "anything physically or emotionally abusive"); *Rodriguez v. Yellow Cab Coop., Inc.*, 206 Cal.App.3d 668, 253 Cal.Rptr. 779, 784 (Ct.App.1988) (refusing to permit an exception to NLRA preemption where "there are no separate allegations concerning the nature of [the employer's] act"); *Meuser v. Rocky Mountain Hosp.*, 685 P.2d 776, 779–80 (Colo.Ct.App.1984) (determining that a letter from an employer, which

threatened discipline, was not sufficiently outrageous conduct to fall within the exception to the preemption rule); *Gouveia v. Napili–Kai, Ltd.,* 65 Haw. 189, 649 P.2d 1119, 1126 (1982) (discerning no outrageous conduct because the physical injury and emotional distress claims were based on a " 'willfully malicious' termination").

{16} By comparison, in those cases cited by Plaintiffs in which the courts allowed IIED claims to go forward, the plaintiffs alleged wrongful behavior that was much more egregious than the discriminatory treatment alleged by Plaintiffs in this case. For example, in *Keehr v. Consolidated Freightways of Delaware, Inc.,* 825 F.2d 133 (7th Cir.1987), a supervisor was accused of making sexually and racially explicit comments about the employee's wife in order to provoke the employee into throwing a punch in order to create grounds to fire the employee. *Id.* at 134–35. The jury found this to be " 'outrageous' conduct" that was " '[w]ilful, callous, or malicious,' " and the Seventh Circuit affirmed the verdict. *Id.* at 137, 142. The employee in *Veal v. Kerr–McGee Coal Corp.,* 682 F.Supp. 957 (S.D.Ill.1988), "was vigorously and maliciously harassed [by the employer] both for joining the union and for filing his workmen's compensation claim[, and t]his harassment allegedly even included [the employer's] officials coming to [the employee's] hospital room and making repeated phone calls to [the employee's] treating physician." *Id.* at 962. Similarly, the court in *Harberson v. Hilton Hotels Corp.,* 616 F.Supp. 864 (D.Colo.1985), held that allegations of perjury and forgery by an employer were enough to constitute outrageous conduct. *Id.* at 866. In *Collins v. General Time Corp.,* 549 F.Supp. 770 (N.D.Ala.1982), the evidence showed that a representative of the employer came to the employee's home after she had broken her ribs on the job, implied that she was malingering, and threatened her job if she did not return to work. *Id.* at 771. The *Collins* court concluded that these facts "may be so outrageous as to constitute an incident upon which a reasonable person, i.e., a jury, could form the belief that [the employer] intended to cause severe emotional distress." *Id.* Additionally, the *Collins* court determined that the employee's claims were not preempted because the employer's actions were not related to a discriminatory labor practice—the employer took no disciplinary action against the plaintiff. *Id.* at 772–73. Therefore, any complaint that the plaintiff had against the employer would have to be pursuant to state tort law because no federal laws were implicated. *Id.* at 772.

{17} In these cases, the plaintiffs were not "seeking damages based on the fact of discriminatory treatment"; instead, they limited their claims to damages that flowed from the employer's outrageous conduct or the manner adopted by the employer to carry out the wrongful treatment. *Keehr,* 825 F.2d at 136–37. *See also Dazzo v. Local 259, United Auto. Aerospace & Agric. Implement Workers of Am.,* 448 F.Supp. 799, 802 (E.D.N.Y. 1978) ("Both 'false' and 'malicious' statements and threats allegedly causing mental disturbance, if proven, may well be sufficient 'outrageous conduct' to constitute an intentional tort justifying recovery under New York law, particularly if they were part of a deliberate campaign of harassment and intimidation."); *Teamsters Local 959 v. Wells,* 749 P.2d 349, 356 (Alaska 1988) ("The threat to [the employee's] life and the constant intrusions into his family affairs constituted outrageous conduct."); *Brown v. Garman,* 364 N.W.2d 566, 570–71 (Iowa 1985) (concluding that the *Farmer* exception allowed an employee's claims where the employee alleged that the employer's actions were "malicious, without just cause or excuse, outrageous, and were committed with the intention of causing or recklessly disregarding the probability of causing [the employee] mental anguish and emotional distress" but also cautioning that the employee must prove that these allegations "involve more than will establish an unfair labor practice subject to the exclusive jurisdiction of the NLRB"); *Pemberton v. Bethlehem Steel Corp.,* 66 Md.App. 133, 502 A.2d 1101, 1105–06, 1112–13 (Ct. Spec.App.1986) (holding that placing an employee under surveillance, circulating documents pertaining to the employee's previous criminal convictions, and sending reports of marital infidelity to the employee's wife is "sufficiently egregious" and "amounts to

more than a mere unfair labor practice," and as a result, is not preempted).

{18} Plaintiffs also rely on *English v. General Electric Co.*, 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), to support their contention that preemption should not ordinarily be implied absent actual conflict with the federal statute. This reliance is misplaced. *English* only considers whether an employee's IIED claim is preempted by the Energy Reorganization Act of 1974, 42 U.S.C. § 5851 (2000), which involves different policy considerations than those relevant to determining preemption under the NLRA. *English*, 496 U.S. at 81–82, 86–87 n. 8, 110 S.Ct. 2270 (stating that the respondent's reliance on decisions determining the preemptive effect of the NLRA was misplaced because "the NLRA, unlike statutes governing the nuclear-employment field, comprehensively deals with labor-management relations from the inception of organizational activity through the negotiation of a collective-bargaining agreement" in order to "provide an informed and coherent labor policy"). We are further unpersuaded by Plaintiffs' citation of *Chavez v. Copper State Rubber of Arizona, Inc.*, 182 Ariz. 423, 897 P.2d 725 (Ct.App.1995), to support the proposition that New Mexico state courts should have jurisdiction over the present claims because the NLRB does not have jurisdiction over a claim for IIED. To the contrary, the court in *Chavez* explicitly held that it would not assume that the state court had jurisdiction merely because the plaintiff did not have a remedy under the NLRB. *Id.* at 733.

{19} The harm suffered by Marvin resulted from the alleged actions of discrimination, discipline, and discharge and not the manner in which the alleged wrongful actions were conducted. Marvin protested these allegedly wrongful actions by filing charges with the NLRB and filing grievances with WTS. Plaintiffs failed to show that WTS's actions constituted outrageous behavior. Consequently, the *Farmer* exception to NLRA preemption does not apply in the present case, and Plaintiffs' IIED claim is therefore preempted by federal law. We further observe that regardless of the federal preemption analysis, the district court would have

properly granted summary judgment to WTS because Plaintiffs failed to allege facts that would support an IIED claim under New Mexico law, which also requires conduct to be outrageous in order for an IIED claim to succeed. *See Baldonado*, 2008–NMSC–005, ¶ 27, 143 N.M. 288, 176 P.3d 277.

## 2. Defamation

{20} The United States Supreme Court has also considered state defamation claims in the context of labor disputes. In *Linn v. United Plant Guard Workers of America, Local 114*, 383 U.S. 53, 55–57, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), the Supreme Court considered whether a manager could maintain an action for libel based on allegedly defamatory statements published by a union and its officers during a union-organizing campaign. The *Linn* Court acknowledged that debate about the federal policy encompassed in the NLRA " 'should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks.' " *Id.* at 62, 86 S.Ct. 657 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Noting that state libel suits could obstruct this federal policy by inhibiting free debate during labor disputes, the Court adopted the actual malice standard articulated in *New York Times Co.* in order to determine whether libel published in the context of a labor dispute would be actionable. *Linn*, 383 U.S. at 63–65, 86 S.Ct. 657. Under this standard, a state remedy for libel in the context of a labor dispute is limited to cases in which the plaintiff can show the following: (1) that the defamatory statements "were circulated with malice" and (2) the statements caused harm beyond the defamation itself such as "injury to reputation, consequent mental suffering, alienation of associates, specific items of pecuniary loss, or whatever form of harm would be recognized by state tort law." *Id.* at 65, 86 S.Ct. 657.

{21} Although Plaintiffs generally claim that Marvin was defamed, the amended complaint does not specifically identify which statements defamed Marvin. *See Andrews v. Stallings*, 119 N.M. 478, 485, 892 P.2d 611,

618 (Ct.App.1995) (noting that it is not the defendant's burden to discern how the plaintiffs are allegedly defamed; instead, the plaintiffs "must plead precisely the statements about which they complain" (internal quotation marks and citation omitted)). In their response brief in opposition to summary judgment on the defamation claim, Plaintiffs did not identify the allegedly objectionable statements. Instead, they simply directed the court to consider the statements made during the arbitration and did not identify which statements, if any, were not privileged. They also failed to dispute any of the allegations set forth as undisputed in WTS's motion. Even in their brief in chief filed with this Court, Plaintiffs merely state that there were "statements made by several individuals that were not made at the arbitration nor pursuant to any complaint or grievance."

■ {22} As we explained above, in order to avoid NLRA preemption, Plaintiffs were required to establish that defamatory statements were circulated with malice and that the statements caused particular harm. *Linn*, 383 U.S. at 64–65, 86 S.Ct. 657. Plaintiffs' amended complaint and response to WTS's motion for summary judgment did not identify specific statements and Plaintiffs therefore could not establish that any statements made by WTS were either circulated with malice or caused particular harm. Because Plaintiffs did not provide sufficient facts to satisfy the *Linn* requirements, their defamation claims are preempted by the NLRA and the district court properly granted summary judgment.

### 3. Retaliatory Discharge

■ {23} In their amended complaint, Plaintiffs also asserted a claim for wrongful discharge for whistle-blowing and alleged that Marvin was first disciplined and then terminated in retaliation for complaining about safety violations and refusing to perform unsafe practices. Specifically, Marvin claims that WTS retaliated against him for complaining about and refusing to operate or "sign off" on dangerous equipment and for filing a safety grievance regarding an unsafe condition. He claimed to have raised these safety issues (1) out of concern that WTS was not following prescribed safety requirements in its operation and handling of waste and (2) out of concern for the welfare and safety of co-workers and the public.

{24} The United States Supreme Court has not yet considered whether claims for retaliatory discharge are preempted by the NLRA. Some courts have held that retaliatory discharge claims are not preempted. *See, e.g., Paige v. Henry J. Kaiser Co.*, 826 F.2d 857, 865 (9th Cir.1987) (holding that actions for wrongful discharge in violation of California's occupational safety and health laws are not preempted under the NLRA because "it is uniquely within the states' police powers to legislate for the health and safety of their citizens, and such regulation does not interfere with the NLRA's goals"); *Luke v. Collotype Labels USA, Inc.*, 159 Cal.App.4th 1463, 72 Cal.Rptr.3d 440, 447 (Ct.App.2008) (observing that if the claim for retaliatory discharge is based on complaints under, or refusal to violate, state occupational safety and health laws, the claim is not preempted even though other causes of action alleging wrongful termination in violation of other state public policies may be preempted). Other courts, however, have concluded that such claims are preempted. *See, e.g., Lontz v. Tharp*, 220 W.Va. 282, 647 S.E.2d 718, 723 (2007). In this case, we need not decide whether Plaintiffs' claim for retaliatory discharge based on the reporting of safety violations is preempted under *Garmon* because Plaintiffs are not entitled to bring such a claim under New Mexico employment law.

■ {25} The employment-at-will doctrine permits an employer to terminate an employee at will in the absence of an express contract limiting the employer's right to do so. *See Silva v. Am. Fed'n of State, County & Mun. Employees*, 2001–NMSC–038, ¶ 10, 131 N.M. 364, 37 P.3d 81. New Mexico recognizes an exception to the employment-at-will doctrine, which allows an at-will employee who is allegedly discharged for reporting unsafe working conditions to bring a retaliatory discharge claim against an employer. *See id.* ¶¶ 10–11; *Gutierrez v. Sundancer Indian Jewelry, Inc.*, 117 N.M. 41, 48–50, 868 P.2d 1266, 1273–75 (Ct.App.1993). Even though New Mexico recognizes an em-

ployee's right to bring a retaliatory discharge claim, that right is limited to at-will employees. *Silva*, 2001–NMSC–038, ¶¶ 12, 21, 131 N.M. 364, 37 P.3d 81; *Vigil v. Pub. Serv. Co. of N.M.*, 2004–NMCA–085, ¶¶ 5–7, 136 N.M. 70, 94 P.3d 813 (holding that the defendant was entitled to summary judgment on the plaintiff's retaliatory discharge claim because the plaintiff was not employed at will and therefore could not bring a claim for retaliatory discharge).

{26} It is undisputed that Marvin was not an at-will employee. The CBA governed the relationship between Marvin and WTS, and it included provisions stating that WTS could only "hire, suspend, discharge or discipline employees for just cause." The CBA also provides for a grievance procedure if an employee believes he was terminated or disciplined unfairly. Marvin availed himself of that procedure after he was suspended and then terminated by WTS. As Marvin could only be terminated for cause under the CBA, he cannot recover for the tort of retaliatory discharge under New Mexico law. *See Barreras v. State of N.M. Corr. Dep't*, 2003–NMCA–027, ¶ 22, 133 N.M. 313, 62 P.3d 770 (recognizing that "a claim for retaliatory discharge is only available to at-will employees" because if "an employee is already protected from wrongful discharge by a contract," any retaliatory discharge claim would essentially "duplicate rights already adhering to the employee under contract").

{27} Plaintiffs claim that WTS waived this defense because it failed to raise Marvin's employment status as an affirmative defense. We disagree. "An affirmative defense ordinarily refers to a state of facts provable by defendant that will bar [the] plaintiff's recovery once a right to recover is established." *Beyale v. Ariz. Pub. Serv. Co.*, 105 N.M. 112, 114, 729 P.2d 1366, 1368 (Ct. App.1986). At-will employment status is an essential element of any successful retaliatory discharge claim. *See* UJI 13–2301 NMRA (stating that a discharge in violation of public policy is as an exception to the rule that a person employed at will may be discharged at any time for any reason or for no reason); *Silva*, 2001–NMSC–038, ¶¶ 12, 21, 131 N.M. 364, 37 P.3d 81. Because Plaintiffs were required to prove that Marvin was an at-will employee before they could recover on a claim for retaliatory discharge, Marvin's at-will status was not an affirmative defense that had to be raised and proved by WTS. We thus affirm the district court's grant of summary judgment on the retaliatory discharge issue.

### 4. Section 301 of the LMRA

{28} We next turn to Plaintiffs' claim that the district court should have conducted the preemption analysis under Section 301 of the LMRA. Section 301 identifies the proper venue for suits brought pursuant to a collective bargaining agreement. *See Paige*, 826 F.2d at 861. Plaintiffs argue that because Marvin was covered by the CBA and the CBA has a grievance procedure in effect to address improper discipline, a preemption argument is properly made only under the LMRA. We disagree.

{29} First, we note that Plaintiffs cite no authority to support this proposition. Therefore, we need not even consider this argument. *See ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't*, 1998–NMCA–078, ¶ 10, 125 N.M. 244, 959 P.2d 969 (holding that appellate courts will not consider propositions unsupported by citation to authority). Second, our review of Section 301 reveals that it is not implicated by Plaintiffs' claims in this case. Section 301 concerns claims that require interpretation of a collective bargaining agreement. *See Wooddell v. Int'l Bhd. of Elec. Workers, Local 71*, 502 U.S. 93, 98, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991) (stating that "a suit properly brought under [Section] 301 must be a suit either for violation of a contract between an employer and a labor organization representing employees in an industry affecting commerce or for violation of a contract between such labor organizations"); *cf. Crenshaw v. Allied Chemical Corp.*, 387 F.Supp. 594, 598 (E.D.Va.1975) (holding that an employee can bring a suit for wrongful discharge under Section 301 of the LMRA if the employee is claiming that the union "breached its duty of fair representation by refusing to fairly, impartially, or honestly represent an employee's interests in a collective bargaining agreement dispute

878

resolution proceeding"). None of Plaintiffs' claims include allegations that WTS breached its obligations under the CBA, nor do they claim that PACE failed to adequately represent Marvin's interests. We have already determined that all of Plaintiffs' claims were properly dismissed. As a result, we need not conclude that Plaintiffs' claims might also be preempted by Section 301 of the LMRA.

## B. Loss of consortium

 {30} The district court concluded that because the loss of consortium claim was dependent on Marvin's claims, once summary judgment was entered on those claims, Martha's claim for loss of consortium was also barred. We agree. "Loss of consortium derives from the underlying cause of action in the physically-injured spouse." *Archer v. Roadrunner Trucking, Inc.*, 1997–NMSC–003, ¶ 11, 122 N.M. 703, 930 P.2d 1155. As a result, the "injured person must be entitled to general damages before the spouse is entitled to loss-of-consortium damages." *Id.* ¶ 13; *see Turpie v. Sw. Cardiology Assocs., P.A.*, 1998–NMCA–042, ¶ 7, 124 N.M. 787, 955 P.2d 716 ("[I]f the defendant is found not to be responsible for the injury suffered by the plaintiff's spouse, the plaintiff cannot recover loss of consortium damages from the defendant."). Accordingly, because we affirm the dismissal of all of Marvin's claims for damages, we must also hold that Martha's claim for loss of consortium was properly dismissed.

## C. Collateral Estoppel

{31} Plaintiffs also argue that the district court improperly denied their motion for partial summary judgment. The motion contended that the findings of fact made by the arbitrator during the grievance proceedings should be given preclusive effect in the state court proceedings against WTS. Based on our decision to affirm the district court's grant of summary judgment to WTS on all of Plaintiffs' claims, we need not address the merits of Plaintiffs' motion for summary judgment based on collateral estoppel.

## IV. CONCLUSION

{32} We affirm the district court's order granting summary judgment in favor of WTS on all of Plaintiffs' claims.

{33} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER and MICHAEL E. VIGIL, Judges.